Seth L. Goldstein, S.B.N. 176882
slglawoffice@gmail.com
2100 Garden Road, Suite H-8
Monterey, California, 93940
Telephone (831) 372 9511
Fax (831) 372 9611
Lead-Counsel for Plaintiffs

Merit Bennett, *Pro Hac Vice*
mb@thebennettlawgroup.com
460 St. Michael's Drive, Suite 703
Santa Fe, New Mexico 87505
Telephone: (505) 983-9834
Fax: (505) 983-9836
Co-Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

**MELANIE STARK; M.S., BY AND THROUGH HIS *GUARDIAN AD LITEM*, CHRISTOPHER STARK; ERIC DARROUGH f.k.a. E.D., BY AND THROUGH HIS *GUARDIAN AD LITEM*, GARY DEMERS; KRISTIN COUGHLIN and ROBERT DARROUGH; DOMINIC ZUCCOLOTTO f.k.a. D.Z., BY AND THROUGH HIS *GUARDIAN AD LITEM*, REBECCA ESPINOZA; LAURA KINSER; SEBASTIAN DAVIS f.k.a. S.D., BY AND THROUGH HIS *GUARDIAN AD LITEM*, JEREMEY SUNDBY; CHRISTOPHER DAVIS; JAMES PERKINS f.k.a. J.P., BY AND THROUGH HIS *GUARDIAN AD LITEM*, SARAH WALTERS; CHERILYN CALER; HAYDEN KING f.k.a. H.K., BY AND THROUGH HIS *GUARDIAN AD LITEM*, KATE MULLER; SUZANNE MULLER; AUSTIN PETERSEN, BY AND THROUGH HIS GUARDIAN AD LITEM, TIMOTHY PETERSEN;**

Plaintiffs,

v.

**GUIDING HANDS SCHOOL, INC.; CALIFORNIA DEPARTMENT OF EDUCATION (CDE); OFFICE OF THE STATE SUPERINTENDENT OF PUBLIC INSTRUCTION (SSPI); TOM TORLAKSON (SSPI); STARANNE S. MEYERS; CINDY KELLER; KIMBERLY WOHLWEND; YET-TO-BE-IDENTIFIED EMPLOYEES, OFFICERS AND/OR AGENTS OF ANY NAMED DEFENDANT;**

Defendants.

**Case No. 2:20-cv-00635- DJC-CSK**

**PLAINTIFFS' FOURTH AMENDED COMPLAINT**

**JURY TRIAL REQUESTED**

**Judge: Hon. Daniel J. Calabretta**

**TAC Filed: 04.30.21**

**Trial Date: Not Set | Stayed**

# PLAINTIFFS' FOURTH AMENDED COMPLAINT

## JURISDICTION

1. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' claims under 42 U.S.C. § 1983, 42 U.S.C. §§ 12131, *et. seq.*, and 29 U.S.C. § 794. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

2. This Court has personal jurisdiction over the remaining Defendants as they are all residents of California.

## VENUE

3. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b), because the acts and omissions upon which this action is based occurred in part in this District within the counties of El Dorado, Amador, Placer and Sacramento.

## THE PARTIES

**Plaintiff Students**

4. **Plaintiff M.S.** was a minor with autism spectrum disorder, Tourette syndrome and ADHD at all times relevant to this complaint. He was placed at GHS by Elk Grove Unified School District ("EGUSD") and Elk Grove Unified SELPA ("EG SELPA") on September 8, 2018, when he was nine years old, and remained there until December 6, 2018. He is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. M.S. is currently a resident of Elk Grove, California. M.S.'s mother is Melanie Stark. Christopher Stark, M.S.'s father, has been appointed as *guardian ad litem* for the purposes of prosecuting this case. M.S. filed a government tort claim against the CDE on April 17, 2019. It was rejected on June 7, 2019. *See* **Attachment A** (in which minor's name has been redacted).

5. **Plaintiff Eric Darrough ("ERIC"), formerly known as E.D.,** was a minor with autism spectrum disorder, anxiety disorder and other mental health and developmental disabilities at all times relevant to this complaint. He was a student in the Folsom-Cordova Unified School District ("FCUSD") and Folsom-Cordova SELPA ("FC SELPA"). ERIC was placed at GHS via his IEP by FCUSD and FC SELPA. ERIC was a student at GHS for one day, January 10, 2017. He is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. He is currently a resident of Woonsocket, Rhode Island. Robert Darrough and Kristin Coughlin, are ERIC's parents. Gary Demers has requested appointment as *guardian ad litem* for the purpose of prosecuting this case.

6. **Plaintiff Dominic Zuccolotto ("DOMINIC"), formerly known as D.Z.,** was a minor with autism spectrum disorder at all times relevant to this complaint. He was placed at GHS by FCUSD and FC SELPA in or about April 2017 and remained there until October 2018. He is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. He is currently a resident of Copperopolis, California. Laura Kinser is DOMINIC's mother. Rebecca Espinoza is DOMINIC's court-appointed guardian ad litem for the purpose of prosecuting this case.

7. **Plaintiff Sebastian Davis ("SEBASTIAN"), formerly known as S.D,** was a minor with depressive disorder, oppositional defiant disorder and developmental coordination disorder at all times relevant to this complaint. He was placed at GHS from 2016 to 2018. He is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. He is currently a resident of Philadelphia, Pennsylvania. Christopher Davis is SEBASTIAN's father. Jermey Sundby is SEBASTIAN's court-appointed *guardian ad litem* for the purpose of prosecuting this case.

8. **Plaintiff James Perkins ("JAMES"), formerly known as JAMES,** was a minor with autism spectrum disorder at all times relevant to this complaint. He was placed at GHS via his IEP by Amador County Unified School District ("ACUSD"), Amador County Office of Education ("ACOE") and the Amador County Office of Education SELPA ("ACOE SELPA") from approximately 2013 to 2018. JAMES is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. He is currently a resident of California. Cherilyn Caler is JAMES's mother. Sarah Walters is JAMES's court-appointed *guardian ad litem* for the purpose of prosecuting this case.

9. **Plaintiff HAYDEN KING ("HAYDEN"), formerly known as H.K.,** was a minor with A.D.H.D., Generalized Anxiety Disorder, Disruptive Mood Dysregulation Disorder, Depression, and other neurodevelopmental disabilities at all times relevant to this complaint. HAYDEN was living in the Mother Lode Unified School District ("MLUSD") and the Placerville Union School District ("PUSD") during the years 2017 through 2019. HAYDEN was placed at GHS in 2017 by MLUSD and remained there until January 2019. HAYDEN is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. HAYDEN is currently a resident of Rescue, California. Suzanne Muller is HAYDEN's mother. Kate Muller is HAYDEN's court-appointed *guardian ad litem* for the purpose of prosecuting this case.

10. **Plaintiff Austin Petersen ("AUSTIN")** was a minor with autism spectrum disorder at all times relevant to this complaint. Austin was living in the Rocklin Unified School District and Placer County SELPA at all times relevant to this complaint. He was placed at GHS by RUSD in September 2013 and remained there until November 2014. AUSTIN is a person with a disability as defined under 42 U.S.C. § 12102(1)(a), Cal. Civ. Code § 51(e)(1), and Cal. Gov't Code §§ 12926 and 12926.1. He is currently a reside of Rocklin, California. Timothy Petersen, AUSTIN's father, is AUSTIN's court-appointed guardian ad litem for the purpose of prosecuting this case.

11. The plaintiffs who were formerly students at Guiding Hands School, Inc. ("GHS") will be referred to collectively as "Plaintiff Students."

**Plaintiff Parents**

12. **Plaintiff Melanie Stark ("STARK")** is M.S.'s mother. She is a resident of Elk Grove, California.

13. **Plaintiff Robert Darrough ("DARROUGH")** is ERIC's father. He is a resident of Port Huron, Michigan.

14. **Plaintiff Kristin Coughlin ("COUGHLIN")** is ERIC's mother. She is a resident of Woonsocket, Rhode Island.

15. **Plaintiff Laura Kinser ("KINSER")** is DOMINIC's mother. She is a resident of Copperopolis, California.

16. **Plaintiff Christopher Davis ("DAVIS")** is SEBASTIAN's father. He is a resident of Philadelphia, Pennsylvania.

17. **Plaintiff Cherilyn Caler ("CALER")** is JAMES's mother. She is a resident of Pine Grove, California.

18. **Plaintiff Suzanne Muller ("MULLER")** is HAYDEN's mother. She is a resident of Rescue, California.

19. Plaintiffs who are parents of the Plaintiff Students shall be referred to collectively in this complaint as "Plaintiff Parents."

**Defendants**

*CDE*

20. **Defendant California Department of Education ("CDE")** is the State of California's department responsible for administering and enforcing laws related to education. California's State Superintendent of Public Instruction ("SSPI") is an office/agent/employee of the CDE and is responsible for certifying, re-certifying, monitoring, investigating, and supervising

nonpublic schools. Cal. Ed. Code §§ 56366.1, 56366.4. The SSPI and the CDE are also responsible for supervising the implementation of laws restricting the use of emergency interventions that involve the use of physical force on children "with exceptional needs," including those placed in nonpublic schools. Cal. Ed. Code § 56520, *et. seq*.; Cal. Ed. Code § 56521(a) and (b).

21. **Defendant Tom Torlakson ("TORLAKSON")** was at all times relevant herein the SSPI. Any reference herein to the CDE, the office of the SSPI and/or to Defendant Torlakson, shall also be deemed to be a reference to all three of these Defendants. TORLAKSON, at all times relevant herein, was acting individually and on behalf of CDE. TORLAKSON was and is also CDE's alter ego, and thereby, individually and/or in concert with the other Defendants, controlled CDE, and is accordingly individually liable for any conduct otherwise attributed herein to CDE, and thereby causing CDE (including any other yet-to-be-identified individual Defendants) to be liable for all of TORLAKSON's and others' (yet-to-be-identified) individual misconduct described herein.

**GHS Defendants**

22. **Defendant Guiding Hands School, Inc. ("GHS")** was a nonpublic school as defined in Cal. Ed. Code § 56034. Pursuant to Cal. Ed. Code §§ 56365(a) and 56366, GHS had Master Contracts and Independent Service Agreements with the LEAs to provide special education services to the Plaintiff Students.

23. **Defendant Staranne S. Meyers ("MEYERS")** was at all times relevant to the complaint the principal and a member of the board of GHS. MEYERS had authority and control over GHS's staff, programs, policies, practices, and training. She had direct responsibility for ensuring the safety of students and GHS's compliance with state and federal education and anti-discrimination laws and regulations. Plaintiffs are informed and believe and thereon allege that MEYERS is a resident of California. MEYERS, at all times relevant herein, was acting individually and on behalf of GHS. MEYERS was and is also GHS's alter ego, and thereby, individually and/or in concert with the other Defendants, controlled GHS, and is accordingly individually liable for any conduct otherwise attributed herein to GHS, and thereby causing GHS (including any other yet-to-be-identified individual Defendants) to be liable for all of MEYERS' and others' (yet-to-be-identified) individual misconduct described herein.

24. **Defendant Cindy Keller ("KELLER")** was at all times relevant to the complaint the executive director and school site administrator of GHS. KELLER had authority and control over GHS's staff, programs, policies, practices, and training. She had direct responsibility for

ensuring the safety of students and GHS's compliance with state and federal education and anti-discrimination laws and regulations. Plaintiffs are informed and believe and thereon allege that KELLER is a resident of California. KELLER, at all times relevant herein, was acting individually and on behalf of GHS. KELLER was and is also GHS's alter ego, and thereby, individually and/or in concert with the other Defendants, controlled GHS, and is accordingly individually liable for any conduct otherwise attributed herein to GHS, and thereby causing GHS (including any other yet-to-be-identified individual Defendants) to be liable for all of KELLER's and others' (yet-to-be-identified) individual misconduct described herein.

25. **Defendant Kimberly Wohlwend ("WOHLWEND")** was at all times relevant to the complaint a classroom teacher at GHS. Plaintiffs are informed and believe and thereon allege that WOHLWEND is a resident of California. WOHLWEND, at all times relevant herein, was acting individually and on behalf of GHS. WOHLWEND was and is also GHS's alter ego, and thereby, individually and/or in concert with the other Defendants, controlled GHS, and is accordingly individually liable for any conduct otherwise attributed herein to GHS, and thereby causing GHS (including any other yet-to-be-identified individual Defendants) to be liable for all of WOHLWEND's and others' (yet-to-be-identified) individual misconduct described herein.

26. At all times relevant to the complaint, MEYERS, KELLER and WOHLWEND, were the employees and/or the agents of GHS and were acting within the scope of their employment and/or agency. Any reference to one of these individuals shall be deemed to be a reference to all individuals associated with or working with the referenced individual. At all times relevant herein, employees and staff of GHS were acting individually and on behalf of GHS. Therefore employees and staff of GHS were and are also GHS's alter ego, and thereby, individually and/or in concert with the other Defendants, controlled GHS, and are accordingly individually liable for any conduct otherwise attributed herein to employees and staff of GHS, and thereby causing GHS (including any other yet-to-be-identified individual Defendants) to be liable for all of employees and staff of GHS's and others' (yet-to-be-identified) individual misconduct described herein.

27. Defendants Yet-to-be-identified Employees, Officers and/or Agents of any Named Defendant (also referred to herein as "GHS staff" or as "GHS administrators") are those unknown culpable individuals whose identity may be discovered through discovery or further investigation; and, upon such discovery, leave of Court to add such individuals shall be sought.

## INTRODUCTION

28. Plaintiff Students of GHS and their parents/guardians—bring this action for damages against Guiding Hands School, its administrators and staff, the California Department of Education ("CDE") and the California State Superintendent of Public Instruction ("SSPI"), and yet-to-be-identified employees, officers and/or agents of any named Defendant.

29. For more than a decade, the CDE and local educational agencies ("LEAs")—such as school districts, county offices of education and Special Education Local Plan Areas ("SELPAs")—have known that using restraints on students carries serious risks for the students' physical and emotional health, including death. They have similarly known of the disproportionate use of such restraints on children with disabilities. (Hereinafter, the use of the terms "LEA" or "SELPA" shall also refer to the CDE and to all of the educational agencies, offices and districts within which the violations of law set forth below were perpetrated.)

30. For over a decade, the U.S. Department of Education ("DOE") has repeatedly notified the CDE of the dangers of using restraints on school children and the unequal impact of such restraints on children with disabilities. The DOE has urged the CDE to develop policies and practices limiting and monitoring the use of restraints.

31. The CDE have also been alerted to the physical and emotional damages restraints have caused children with disabilities via lawsuits, parent and student complaints, media reporting, behavior investigation reports, and investigations by and communications from advocates. Defendants, including all named individual Defendants, have long been aware of the particular dangers of restraint use in nonpublic schools, which receive federal and state funding to educate students with disabilities, but continue to utilize these restraints with minimal to no oversight, despite state and federal laws and regulations requiring such monitoring by state and local agencies. (When reference hereinbelow is made to any institutional Defendant, reference is also thereby made to include all named employees, agents and/or representatives of such Defendant.)

32. The significant harm caused to children subjected to the aggressive disciplinary controls and restraints employed by "behavioral intervention" systems have also been well publicized in the media, nationally and in California, often as a result of lawsuits filed after a child has been seriously injured or killed by the use of such methods.

33. Despite these well-known dangers and discrimination against disabled children, nonpublic schools like Defendant GHS had a policy and practice of using such restraints as a substitute for the interventions described in students' positive behavior intervention plans ("BIPs").

GHS restrained students frequently, with excessive force, in response to predictable behaviors that did not constitute an immediate or serious threat to the student or others, for extended periods of time, and on students whose disabilities elevated the risk of harm from using restraints.

34. GHS could do so because the CDE abdicated their responsibilities to monitor and supervise restraint use in nonpublic schools and to ensure compliance with state and federal laws prohibiting discrimination and illegal restraint use. Unable and unwilling to provide services to children whose disabilities often manifest in behavioral problems, attempting to shift responsibility for the Plaintiff Students to GHS. The CDE justified and continue to justify the failure to perform their statutory and regulatory duties to monitor, supervise, train and ensure compliance with laws prohibiting discrimination and child abuse by claiming that such responsibilities fall not upon them, but upon other public agencies or solely upon the nonpublic schools. This shifting of accountability has created an environment wherein no public agency is willing to acknowledge its responsibility to ensure that students with disabilities are educated in a safe and non-discriminatory environment, free of physical and emotional abuse. Thus, the CDE continued to certify GHS, and absolve the LEAs of the responsibility to educate and ensure the safety of students with disabilities by handing them off to GHS and never looking back.

35. As a result, the Plaintiff Students in this case were subjected to abusive restraints that caused them significant physical and emotional injuries. It took the murder of a fellow GHS student by GHS staff members, who placed him in a prone restraint for almost two hours on November 28, 2018, to force the CDE to conduct a real investigation and take action against GHS.

36. There exists an ongoing criminal case in El Dorado County regarding the wrongful death of former student Max Benson. Also *see* civil Case Name: *Estate of Max Benson et al v. Guiding Hands School, Inc. et al*, Case Number: 2:25-cv-00670-DJC-CSK, severed from this case. As part of the criminal investigation, a large amount of documentation (approximately 41 banker's boxes) and other physical and electronic evidence were seized from GHS and other defendants. Because the criminal case pending against three of the defendants has yet to be concluded, discovery has been delayed. The El Dorado County Superior Court has issued a protective order covering all 41 bankers boxes and all other physical and electronic data evidence seized from GHS pursuant to a District Attorney search warrant, thus preventing Plaintiffs from accessing these documents and information. Plaintiffs reserve their right to seek leave to amend their complaint to name additional defendants and to bring additional claims against current defendants.

37. The CDE suspended GHS's nonpublic school certification on December 5, 2018, and permanently revoked its certification on January 11, 2019. The CDE boasts of its "prompt action," but this action came too late for Plaintiffs, who suffered significant physical and emotional injuries due to the brutal methods of GHS and the indifference of the CDE and the LEAs.

**PUBLIC EDUCATION IN CALIFORNIA**

38. The California Supreme Court has recognized that, unlike many other states, California has assumed under its constitution a specific duty to provide public education. *Butt v. State of California*, 4 Cal.4th 668, 680-81 (1992). While the Education Code may provide autonomy to LEAs, they are nonetheless "the State's agents for local operation of the common school system . . . and the State's ultimate responsibility for public education cannot be delegated to any other entity." *Id*. at 681.

39. State law also guarantees free special education instruction and services to all qualifying children. Cal. Ed. Code § 56040(a). This responsibility falls on the state and the local educational agency (LEA) in which the student resides. Cal. Ed. Code § 56344(c); 20 U.S.C. § 1412(a)(11).

40. The state receives federal funding to provide educational services to children with disabilities pursuant to 20 U.S.C. §§ 1411-1413 and distributes this money to the LEAs.

41. The state's supervisory and monitoring duties are spelled out in state and federal law. 20 U.S.C. § 1412(a)(11) (although a state may allocate the development and implementation of plans to provide special education to LEAs, it nonetheless retains the ultimate responsibility for ensuring compliance with the IDEA); Cal. Ed. Code § 56125(b)("The [State Superintendent of Public Instruction] shall monitor the implementation of local plans by periodically conducting onsite program and fiscal reviews, in accordance with Sections 300.114 to 300.120, inclusive, of Title 34 of the Code of Federal Regulations."); § 56135(a)("The [SSPI] shall be responsible for assuring provision of, and supervising, education and related services to individuals with exceptional needs as specifically required pursuant to the Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 et seq.)"); § 56606 ("The Superintendent shall provide for onsite program and fiscal reviews of the implementation of [plans approved under this part]. . . . "); § 56521(b)("The Superintendent of Public Instruction shall monitor and supervise the implementation of" state laws regarding "emergency interventions"); § 56600.6 (The SSPI must monitor pupil and program performance results, and provide monitoring and technical assistance

to assure compliance with the IDEA). As the code was amended in 2019 and 2020, all references to the California Code reflect the statutes that were in effect through 2018.

42. In California, every school district must belong to a special education local plan area ("SELPA") which administers a local plan for providing the special education services needed by all students in the defined area and for allocating special education funding. Cal. Ed. Code §§ 56195 and 5195.1. The district may belong to a single-district SELPA, a multi-district SELPA, or a SELPA coordinated by the county office of education. Cal. Ed. Code § 56195.1.

**THE LEAS**

43. As required under California law, nonpublic schools ("NPS") are part of the continuum of services local educational agencies must make available to students. Cal. Ed. Code §§ 56360, 56361(e), 56365(a). If the LEA does not have the appropriate services or setting for a child who qualifies for special education, the LEA may contract with and pay a nonpublic school to provide such services in exchange for state and federal education funds. Cal. Ed. Code §§ 56365(a)-(d), 56366; 20 U.S.C. §§ 1411-1413.

44. An LEA may place a child in a nonpublic school (NPS) only after it has determined that the placement is appropriate and, after placement, must regularly evaluate the student's progress and continuing suitability of the NPS placement. Cal. Ed. Code §§ 56342.1 and 56366(a)(2)(B).

45. A student placed in an NPS pursuant to Cal. Ed. Code §§ 56365 "will be deemed to be enrolled in public schools" for the purpose of state and federal funding, and the LEA shall pay the NPS "the full amount of the tuition for individuals with exceptional needs that are enrolled in programs provided by the" nonpublic school. Cal. Ed. Code § 56365(b) and (d).

46. Plaintiffs allege on information and belief that when the LEAs placed the Plaintiff Students at GHS via their IEPs, each Plaintiff Student's SELPA and/or school district had a Master Contract with GHS to provide educational services in exchange for federal and state special education funds, as required by law. The LEAs and GHS also entered an Individual Services Agreement for each of the Plaintiff Students placed at GHS via their IEP.

47. The Master Contract states that the NPS is an independent contractor. It also states that the NPS shall provide "special education and/or related services to students with exceptional needs under the authorization of California Education Code sections 56157, 56361 and 56365 et seq. and Title 5 of the California Code of Regulations section 3000 et seq., AB490 (Chapter 862, Statutes of 2003) and AB1858 (Chapter 914, Statutes of 2004)."

**CORPORAL PUNISHMENT AND BEHAVIORAL INTERVENTIONS**

48. California prohibits corporal punishment in public schools. Cal. Educ. Code § 49001(b). It defines "corporal punishment" as "the willful infliction of, or willfully causing the infliction of, physical pain on a pupil." Cal. Educ. Code § 49001(a). Exempted from the definition is "[a]n amount of force that is reasonable and necessary for a person employed by or engaged in a public school to quell a disturbance threatening physical injury to persons or damage to property, for purposes of self–defense, or to obtain possession of weapons or other dangerous objects within the control of the pupil." *Id*.

49. The California legislature has enacted laws encouraging positive behavioral interventions and placing restrictions on "behavioral interventions" that use physical force on children "with exceptional needs," including those in nonpublic schools. Cal. Ed. Code § 56520, et. seq." Cal. Ed. Code § 56521(a).

50. Although the California legislature enacted additional restrictions on restraints and other emergency interventions in 2019 and 2020, those enactments do not apply to this case. All references are to the California code in effect prior to January 2019.

51. "Emergency interventions may only be used to control unpredictable, spontaneous behavior that poses clear and present danger of serious physical harm to the individual with exceptional needs, or others, and that cannot be immediately prevented by a response less restrictive . . . " Cal. Ed. Code § 56521.1(a).

52. The education code prohibits using "emergency interventions:" a) as a substitute for the positive interventions outlined in a student's behavioral intervention plan; b) "for longer than is necessary to contain the behavior;" c) that employ the use of prone restraints by staff who have not been trained those procedures; d) that exert "[a]n amount of force that exceeds that which is reasonable and necessary under the circumstances." Cal. Ed. Code § 56521.1(b)-(d).

53. The law requires that school officials notify the child's parents or guardians within one school day if an emergency intervention is used and complete a "behavioral emergency report" ("BER"). Cal. Ed. Code § 56521.1(e). The purpose of BERs is "[t]o prevent emergency interventions from being used in lieu of planned, systematic behavioral interventions" and they must be "immediately be forwarded to, and reviewed by, a designated responsible administrator." Cal. Ed. Code § 56521.1(e) and (f). When the child has a "positive behavioral intervention plan", the law requires an IEP team meeting within two days to determine whether the plan should be modified. Cal. Ed. Code § 56521.1(h).

54. Under Cal. Ed. Code § 56521.2, neither LEAs nor nonpublic schools may "authorize, order, consent to, or pay for" interventions that, among other prohibitions: 1) are designed or likely to cause physical pain; 2) deny adequate "food, water, . . . physical comfort, or access to bathroom facilities;" 3) are designed, used or likely to subject the student to "verbal abuse, ridicule, or humiliation, or that can be expected to cause excessive emotional trauma;" 4) preclude adequate supervision of the student; or 5) deprive the student of one or more of his senses. Cal. Ed. Code § 56521.2(a)(1)(3)(4)(7) and (8).

55. Prone restraints are prohibited, except as a limited emergency intervention subject to the prohibitions outlined above in section 56521.1. Cal. Ed. Code § 56521.2(a)(5).

56. Schools are instructed to consider the use of "positive behavioral interventions and supports, and other strategies, to address" behavior that impedes the child's learning or that of other students, consistent with federal law. Cal. Ed. Code § 56521.2(b).

57. Compliance with these laws is a condition of receiving federal funding for special education. Cal. Ed. Code § 56523(d).

58. As a condition of certification by the California Department of Education, an NPS must certify that it will not accept students whose IEP services it cannot provide and that its written policy for student discipline "is consistent with state and federal law and regulations." Cal. Ed. Code § 56366.10(a) and (d).

**CALIFORNIA LAW PROHIBITS AND DEFINES CHILD ABUSE BY CODE**

59. California Penal Code Section 273a(b) defines child abuse as "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor."

60. California Penal Code Section 273d(a) defines child abuse as "Any person who willfully inflicts upon a child any cruel or inhuman corporal punishment or an injury resulting in a traumatic condition is guilty of a felony."

61. By and through these statutes, California bans the use of punishment of a child that would involve the unreasonable assault of a child by restraining him unnecessarily or in violation of a statute causing any psychological harm, or physical injury, including by leaving marks or bruises that would constitute a "traumatic condition".

62. As will be shown below, in numbers of the situations described herein wherein the children were placed into restraints, they were left with physical marks and injuries and with long-lasting psychological harm and damages.

**GHS'S SYSTEMIC ABUSE AND DISCRIMINATION**

63. Despite the laws prohibiting corporal punishment of students, restricting the use of restraints and requiring that educators implement positive behavioral interventions, GHS had a lengthy, well-documented policy and practice of ignoring students' Behavior Improvement Plans (BIPs) and instead restrained students in response to predictable, disability-related behaviors that did not constitute a clear and present threat to the safety of the students or to others.

64. The application of the restraints constituted corporal punishment, child abuse and excessive force. GHS restrained students repeatedly, for excessive periods of time, with excessive force and without monitoring their conditions or providing them with periodic breaks, access to the restroom, food or water. GHS restrained students in positions well-known among educators to carry significant risks to the health and safety of those restrained, especially persons with the disabilities and characteristics the Plaintiff Students were known to have. More often than not, the restraints not only failed to solve the students' behavior issues, but aggravated them. GHS nonetheless continued to use the violent and ineffective restraints, despite the legal requirements to use the positive and less-restrictive techniques outlined in the students' behavior improvement plans. The restraints caused pain and physical injuries to the Plaintiff Students, some of which were long-term and/or permanent. The restraints were dehumanizing and caused serious trauma and emotional distress and related injuries to the Plaintiff Students.

65. GHS's administrators were fully aware of the restraints administered by their staff and often witnessed or participated in them. More important, GHS's administrators approved of and encouraged the use of restraints as a primary form of behavior control, in lieu of the behavior interventions outlined in students' BIPs. In fact, it was GHS's policy and practice to use illegal, frequent and excessive restraints in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of the students or others.

66. GHS did not sufficiently or effectively train its staff in non-physical or positive behavior interventions. Nor did it have effective policies, practices or training in recognizing medical emergencies, providing first aid or CPR, or how and when to alert emergency personnel. GHS did not provide sufficient or effective training on how to reduce danger and injury in the event

that a restraint was truly warranted, including performing the restraint safely, for no longer than necessary, while providing continuous monitoring of the student.

67. GHS misrepresented and/or failed to disclose material facts to the parents of students prior to enrollment and while the students were at the school. They misrepresented that GHS staff had the proper experience and training for dealing with the disabilities and behavior issues of the students, that they were skilled in using positive behavior interventions, that they only used restraints when absolutely necessary for the safety of the student or others, and that they had sufficient staff to supervise the students and provide non-physical, positive behavior prevention and intervention techniques.

68. GHS did not, as required by law, always complete a BER or notify parents when a student was restrained and/or injured. Even when GHS notified the parents or the parents otherwise learned about the restraints, GHS and its staff falsely represented the length, severity of and reasons for the restraints. It also falsely represented that the restraints were legal, appropriate and the only way to keep the students and others safe. In the case of most of the parents, it was not until they learned that the CDE was investigating GHS following Max Benson's death that they realized that GHS and its staff were regularly and systematically substituting the behavior interventions in their students' BIPs with excessive and dangerous restraints in response to predictable, disability-related conduct that did not constitute a clear and present danger to the safety of the students or others. It was not until the facts regarding rampant and systemic child abuse and discrimination came to light as a result of the media attention and investigations following Max Benson's death that Plaintiffs discovered that the CDE and the LEAs knew or should have known of the rampant child abuse and discrimination occurring at GHS, yet ignored their legal responsibilities to monitor, investigate or stop GHS or to remove students from the school and transfer them to a safe, nondiscriminatory placement.

69. Plaintiffs do not know the dates of all of the restraints to which GHS subjected their children, the complete factual circumstances, or the names of all individuals involved. Plaintiff parents have attempted to obtain their children's educational records from GHS, but GHS has not responded. Moreover, documents seized from GHS pursuant to a search warrant as part of a criminal prosecution of WOHLWEND, MEYERS and KELLER have been placed under a protective order by the criminal court and cannot currently be accessed by Plaintiffs. Plaintiffs have also requested their educational records from the LEAs but have not been able to obtain all of the

records to which they are legally entitled. Plaintiffs reserve their right to amend their complaint to add Defendants and/or claims.

**DEFENDANT CDE**

70. The CDE has oversight over nonpublic schools. Nonpublic schools are certified by the CDE's head, the State Superintendent of Public Instruction ("SSPI") (here, Defendant Torlakson) who must conduct onsite reviews of the NPS facility and program prior to certification and every three years thereafter, unless the SSPI receives a formal complaint against the NPS, in which case the onsite review should be conducted once a year. Cal. Ed. Code § 56366.1(a) and (e)(1).

71. The NPS must certify to the SSPI that it will not accept students whose services it cannot provide and that its policy for student discipline "is consistent with state and federal law and regulations." Cal. Ed. Code § 56366.10(a) and (d).

72. The SSPI "shall conduct an investigation of a nonpublic, nonsectarian school or agency onsite at any time without prior notice if there is substantial reason to believe that there is an immediate danger to the health, safety, or welfare of a child." Cal. Ed. Code § 56366.1(i)(1). The SSPI must also investigate the NPS if it "receives evidence of a significant deficiency in the quality of educational services provided". Cal. Ed. Code § 56366.1(i)(3).

73. The SSPI must also "monitor the facilities, the educational environment, and the quality of the educational program, including the teaching staff, . . . of an existing certified nonpublic, nonsectarian school or agency," which includes onsite reviews every two out of three years. Cal. Ed. Code § 56366.1(j).

74. The SSPI may revoke or suspend an NPS's certification for multiple reasons, including violation of state or federal laws, conduct that its harmful to a student's health, welfare or safety, failure to comply with the Master Contract, and failure to provide appropriate services or implement a student's IEP. Cal. Ed. Code § 56366.4(a).

75. At all times relevant to the complaint, Tom Torlakson was the SSPI and an employee and/or agent of the CDE, acting within the scope of his employment and/or agency. At all times relevant to the complaint, the legal duties of the SSPI and the CDE included but were not limited to:

- Monitoring and supervision of the implementation of laws restricting the use of emergency interventions that involve the use of physical force on children "with

exceptional needs," including those placed in nonpublic schools. Cal. Ed. Code § 56520, et. seq.; Cal. Ed. Code § 56521(a) and (b);

- Monitoring "the implementation of local plans by periodically conducting onsite program and fiscal reviews," including at nonpublic schools. Cal. Ed. Code § 56125(b);
- Assuring "provision of, and supervising, education and related services to individuals with exceptional needs as specifically required pursuant to the Individuals with Disabilities Education Act." Cal. Ed. Code § 56135(a);
- Providing onsite program reviews of the implementation of special education plans, Cal. Ed. Code § 56606;
- Monitoring pupil and program performance results, and provide monitoring and technical assistance to assure compliance with the IDEA, Cal. Ed. Code § 56600.6.
- Post-certification onsite reviews of nonpublic schools every three years if there are no formal complaints, but once a year if there has been a formal complaint against the school. Cal. Ed. Code § 56366.1(e)(1);
- Onsite, unannounced investigations of nonpublic schools "if there is substantial reason to believe that there is an immediate danger to the health, safety, or welfare of a child." Cal. Ed. Code § 56366.1(i)(1);
- An investigation of the nonpublic school if the SSPI "receives evidence of a significant deficiency in the quality of educational services provided." Cal. Ed. Code § 56366.1(i)(2); and
- Monitoring of "the facilities, the educational environment, and the quality of the educational program, including the teaching staff" of any certified nonpublic school, which includes onsite reviews every two out of three years. Cal. Ed. Code § 56366.1(j); and

76. The U.S. Department of Education ("DOE") has repeatedly informed educational agencies and officials, including the California Department of Education and the SSPI, that restraints were being used disproportionately against children with disabilities.

77. On July 31, 2009, then U.S. Secretary of Education, Arne Duncan, sent a letter to the chief state school officers informing them of congressional testimony from the Government Accountability Office ("GAO") about "the abusive and potentially deadly misapplication of

seclusion and restraint techniques in schools." https://www2.ed.gov/policy/elsec/guid/secletter/090731.html, Arne Duncan, Letter to Chief State School Officers Regarding the Use of Seclusions and Restraints in Public and Private Schools, July 31, 2009. Duncan urged "each State to review its current policies and guidelines regarding the use of restraints and seclusion in schools to ensure every student is safe and protected, and if appropriate, develop or revise its policies and guidelines." *Id*.

78. The GAO congressional testimony referenced in Duncan's letter detailed an examination of ten restraint and seclusion cases across the U.S. involving a criminal conviction, a finding of civil or administrative liability, and/or a large financial settlement. The cases shared the following elements: "(1) children with disabilities were sometimes restrained and secluded even when they did not appear to be physically aggressive and their parents did not give consent; (2) facedown or other restraints that block air to the lungs can be deadly; (3) teachers and staff in these cases were often not trained in the use of restraints and techniques; and (4) teachers and staff from these cases continue to be employed as educators." https://www.gao.gov/assets/130/ 122526.pdf, U.S. GAO Testimony Before the Committee on Education and Labor, House of Representatives, "Seclusions and Restraints: Selected Cases of Death and Abuse at Public and Private School and Treatment Centers," May 19, 2009 ("GAO Report"), at 7.

79. The GAO warned that the restraint techniques used against children were dangerous and likely to cause physical injury "because they may involve physical struggling, pressure on the chest, or other interruptions in breathing" and that children "can be severely traumatized during restraint." GAO report at 1. The GAO noted that in some cases, the restraints resulted in death. *Id*., at 2. "Of the 10 closed cases we examined, 4 involved children who died as a result of being restrained. In all 4 cases, staff members used restraint techniques that restricted the flow of air to the child's lungs. In one of these cases, an aide sat on top of a child to prevent him from being disruptive and ultimately smothered him. The other cases related to the use of different types of prone restraints, a technique that typically involves one or more staff members holding a child face down on the floor. Although some of the teachers and staff involved in these cases were trained on the use of prone restraints, the children in their care still died as a result of its use." *Id*., at 8-9.

80. The GAO found that "[a]lmost all of the allegations we identified involved children with disabilities." GAO report at 5. "In addition, 9 of our 10 closed cases involve children with disabilities or a history of troubled behavior. The children in these cases were diagnosed with autism or other conditions, including post-traumatic stress disorder and attention deficit

hyperactivity disorder. Although we did not evaluate whether the seclusion and restraint used by the staff in our cases was proper under applicable state laws, we did observe that the children in the cases were restrained or secluded as disciplinary measures, even when their behavior did not appear to be physically aggressive." *Id*., at 7-8.

81. Plaintiffs are informed and believe and thereon allege that the GAO report and Arne Duncan's accompanying letter were provided to the CDE and the SSPI on or shortly after July 31, 2009.

82. In 2012, the DOE issued a resource guide to state and local educators recommending fifteen recommended policies and practices that states and LEAs should implement to protect children from the dangers of restraints. https://www2.ed.gov/ policy/seclusion/ restraints-and-seclusion-resources.pdf, U.S. Department of Education, Restraint and Seclusion: Resource Document, May 15, 2012 ("Resource Doc."). The DOE warned that "the use of restraint and seclusion can, in some cases, have very serious consequences, including, most tragically, death. There is no evidence that using restraint or seclusion is effective in reducing the occurrence of the problem behaviors that frequently precipitate the use of such techniques." Resource Doc. at 2. "Physical restraint or seclusion should not be used except in situations where the child's behavior poses imminent danger of serious physical harm to self or others and restraint and seclusion should be avoided to the greatest extent possible without endangering the safety of students and staff." *Id*. Prone restraints were specifically condemned: "Prone (i.e., lying face down) restraints or other restraints that restrict breathing should never be used because they can cause serious injury or death." *Id*., at 16.

83. Additionally, the U.S. Department of Justice, Office of Civil Rights issued a Dear Colleague Letter on Restraint and Seclusion of Students with Disabilities on December 28, 2016, notifying educational agencies that students with disabilities were being restrained at a much higher rate than other students. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201612-504-restraint-seclusion-ps.pdf ("2016 OCR Letter"). In the letter, OCR noted that federal law, including the ADA and Section 504, significantly limits the use of restraints in public school districts.

84. The letter stated:

> According to [OCR's Civil Rights Data Collection], during the 2013-14 school year, students with disabilities were subjected to mechanical and physical restraint and seclusion at rates that far exceeded those of other students. Specifically, students with disabilities served by the Individuals with Disabilities Education Act (IDEA) represented 12% of

> students enrolled in public schools nationally, but 67% of the students who were subjected to restraint or seclusion in school. Based on data reported to OCR, approximately 100,000 students were placed in seclusion or involuntary confinement or were physically restrained at school to immobilize them or reduce their ability to move freely, including more than 69,000 students with disabilities served by the IDEA. Data disparity alone does not prove discrimination. The existence of a disparity, however, does raise a question regarding whether school districts are imposing restraint or seclusion in discriminatory ways.
>
> 2016 OCR Letter, at 2.

85. Again on November 22, 2016, then U.S. Secretary of Education John B. King Jr. sent a letter to governors and chief state school officers calling for the elimination of corporal punishment in education. "It is difficult for a school to be considered safe or supportive if its students are fearful of being physically punished by the adults who are charged with supporting their learning and their future," King wrote. The letter reiterated that corporal punishment is disproportionately applied to Black students and those with disabilities. It cited studies demonstrating that corporal punishment is ineffective and has negative impacts on cognitive functioning and brain development. King also pointed to research showing that children who have been subjected to physical punishment "are more likely to develop mental health issues, including alcohol and drug abuse or dependence, mood disorders, anxiety disorders, and other personality disorders." https://www2.ed.gov/policy/gen/guid/school-discipline/files/corporal-punishment-dcl-11-22-2016.pdf. Plaintiffs are informed and believe and accordingly allege that the CDE and SSPI TORLAKSON received a copy of this letter at or around the time it was published.

86. The CDE and SSPI TORLAKSON were well aware of the warnings from the US DOE and OCR that restraints and physical punishment carried significant risks of physical injury, emotional trauma and death and that students with disabilities were being restrained at a much greater rate than non-disabled students. On January 12, 2018, TORLAKSON sent a letter to SELPA directors, special education administrators for county offices of education, nonpublic school administrators and school district special education directors to "remind" them of state law regarding the use of restraints. TORLAKSON referenced the 2012 Resource Document and the 2016 OCR Letter as resources. https://www.cde.ca.gov/sp/se/ac/om011218.asp.

87. Between 2005 and 2012, the numbers of "behavioral emergency reports" (which schools must complete whenever a student is subjected to a "behavioral emergency intervention" ("BER") or serious property damage has occurred) submitted to the CDE more than doubled. These

figures demonstrated that BERs occurred at double the rate in nonpublic schools (which almost exclusively serve children with disabilities) than they did in the general public school population.

88. According to data submitted to the CDE for the 2011-12 school year, nonpublic schools educated only 2 percent of the special education students in California, yet they filed 66 percent of the behavioral emergency reports with the CDE that year. https://edsource.org/2015/little-oversight-of-restraint-practices-in-special-education/78040.

89. A review of the restraint data submitted to the CDE between 2005 and 2012 by the nonprofit organization EdSource also revealed that school staff regularly responded to behavioral emergencies by restraining the student (78 percent of the incidents reported) and that approximately 44 percent of the restraints applied were prone restraints, which the U.S. Department of Education in 2012 warned "should never be used" on special education students due to a risk of serious injury or death.https://edsource.org/2015/seven-charts-that-put-restraint-and-seclusion-in-context/66794.

90. Despite repeated reports about the increasing use of restraints and their disproportionate use on students with disabilities and in nonpublic schools, the CDE did not review the BER data it received to look for trends. When asked in 2015 about the fact that the number of BERs reported to the CDE between 2005 and 2012 had doubled and that nonpublic schools were reporting significantly greater numbers of BERs, then CDE director of special education Fred Balcom responded with indifference: "I wouldn't speculate on it – whether the number is appropriate or too much or too little. It is what it is." He explained that CDE policy and practice did not include proactive monitoring of restraint use in California's schools, but that the CDE took action only in response to a complaint to the CDE. https://edsource.org/2015/little-oversight-of-restraint-practices-in-special-education/78040.

91. The CDE and SSPI Tom Torlakson also resisted legislative efforts to limit the use of restraints in California. In fact, TORLAKSON successfully opposed a bill introduced in the California Assembly in 2011 that would have significantly limited the ability of teachers to restrain students arguing that it "would establish overly prescriptive definitions of restraint in the EC (Education Code) accompanied with the restrictive conditions upon when they may be used in emergency situations. This would undermine the professional judgment teachers and administrators use when faced with a serious or imminent threat to the student, their peers or themselves." Bill Analysis, AB-519, 2011-2012 at 8, found at http://leginfo.legislature.ca.gov/faces/bill AnalysisClient.xhtml?bill_id=201120120AB519.

92. Instead of limiting restraints, the California legislature in 2013 repealed a then-existing requirement that SELPAs collect and report annual data on Behavioral Emergency Reports to the CDE. Despite their knowledge that restraints were being disproportionately applied against children with disabilities and at nonpublic schools, the CDE and SSPI TORLAKSON did not respond by implementing proactive auditing of BERs within SELPAs or at nonpublic schools. Indeed, the CDE and TORLAKSON sent out a letter in March 2014 to SELPAs, special education administrators of county offices of education, and nonpublic school administrators explaining the elimination of requirements to report BER data to the CDE. The CDE categorized the elimination of the reporting requirement as a way to "reduce unnecessary costs" https://www.cde.ca.gov/sp/se/ac/ bipltr031414.asp.

93. The CDE and TORLAKSON demonstrated their deliberate indifference to the discrimination children with disabilities are subjected to at nonpublic schools by repeatedly failing to monitor those schools or ensure compliance with laws prohibiting abuse—including improper restraint use—at nonpublic schools throughout California. Not only did the CDE and TORLAKSON fail to proactively monitor and ensure compliance with the laws prohibiting abuse and improper restraint use against children with disabilities at nonpublic schools, they failed to react rapidly or effectively to specific complaints of restraint abuse.

94. In 2014, the mother of a disabled student sued Tobinworld (which ran a chain of nonpublic schools in California) and the Antioch Unified School District, asserting that in 2013 Tobinworld staffers twice pinned her 7-year-old son to the ground, bloodying his nose and bruising him.

95. In October 2014, the CDE received a complaint against Tobinworld II and Tobinworld III, notifying it that the husband of Tobinworld's owner's, Matthew Israel, had been working at the school without proper documentation, background checks or notification to the school districts. Israel had previously been banned in 1986 by the California attorney general from running a similar school after findings that students had been severely abused, and one had died as a result of being restrained. Israel moved to the East Coast and ran an institute that was investigated by New York, Massachusetts and the U.S. Department of Justice for using electronic skin shocks to control student behavior.

96. In response to the citizen complaint against Tobinworld, the CDE did not conduct an onsite visit for almost 3 months. It took almost 10 months to complete the investigation and take any action. In addition to finding procedural violations regarding the hiring of Israel, the CDE

found that the schools did not have sufficient numbers of certified staff and that its policies and procedures for behavioral interventions did not comply with legal requirements. The CDE suspended the certification of both locations—preventing them from accepting new students, demanding the necessary documentation for Israel and other staff, and requiring them to work with a CDE consultant to bring the school into compliance. *See* **Attachment B**. The CDE reinstated the schools' certifications in less than four months in December 2015. *See* **Attachment C**.

97. Several weeks later, a video emerged showing Tobinworld II staff restraining and hitting a nine-year-old child with disabilities in the face by adult staff. Shortly thereafter, on January 15, 2016, a group of non-profits who advocate for the rights of students with disabilities—the American Civil Liberties Union ("ACLU"), Disability Rights California ("DRC"), and Disability Rights Education and Defense Fund ("DREDF")—sent a letter to SSPI TORLAKSON and the interim director of Special Education at the CDE, **Attachment D** to this complaint. The letter outlined the ongoing use of violence and restraints against students with disabilities in California's public and "nonpublic" schools, abuse of which the CDE had long been aware and against which it had failed to take effective action. "By failing to monitor, by issuing incomplete relief to address legitimate complaints of violence, and by continuing to certify and fund schools engaged in these practices, CDE is contributing to the continuance, rather than the elimination, of this abuse." The advocates noted reports of repeated abuse and improper restraints at a group of nonpublic schools, and urged the CDE "to take immediate steps to protect children with disabilities in segregated school sites . . . ."

98. The letter went on: "Despite formal complaints, media reports, and multiple lawsuits – costing our public schools millions of dollars – the California Department of Education has no proper system to monitor the treatment of students with disabilities, investigate and resolve complaints, or provide meaningful technical assistance – all steps that are mandated by federal and state law." The non-profits urged the CDE to act immediately to protect students with disabilities in California schools from excessive force and abuse with a particular focus on "segregated"—or nonpublic—schools. Among other recommendations, they urged CDE to take the following actions:

- "Collect and analyze data from all other segregated school sites, and conduct unannounced site visits to monitor the use of force and isolation."

- "Immediate review and remediation of the policies, procedures, and practices of all California school districts to eliminate the improper use of force on children with disabilities."
- "Develop effective policies, procedures, and practices for school districts so that they may eliminate the improper use of force on children with disabilities.
- "Ensure that school districts immediately implement these policies, procedures, and practices."
- "Ensure that school districts are provided with the training and technical assistance to create the least restrictive environment for children with disabilities and to promote positive behavioral support."
- "Create an ombudsman program with a toll-free number to ensure that parents and students are informed of their rights regarding the use of force and isolation in schools."

99. The CDE and TORLAKSON responded to the letter two months later on March 18, 2016. **Attachment E** is a copy of correspondence from Edmundo Aguilar, Assistant General Counsel for the CDE, to the ACLU, DREDF and DRC dated March 18, 2016. The CDE acknowledged that it has "general supervisory powers and responsibilities for oversight of educational instruction in schools receiving state or federal funding", including nonpublic schools. It acknowledged that it is "responsible for certification, monitoring, and complaint investigation regarding" nonpublic schools. Yet, despite overwhelming evidence that children with disabilities were being restrained and abused on a regular basis throughout nonpublic schools in California and despite evidence that the CDE's corrective actions against Tobinworld had not been effective, the CDE insisted it had performed and was performing its duties effectively. It did not offer to undertake any of the actions urged in the January 2016 letter.

100. Nor did the CDE suspend Tobinworld II's license in response to the video that emerged in January 2016. Rather, the school closed on its own in July 2016 when local school districts pulled their students out, and the school lost those funds. https://edsource.org/2016/tobinworld-closing-its-antioch-school-for-special-education-students/566741.

101. Despite knowledge of repeated abuse against students at Tobinworld schools, the CDE allowed Tobinworld to continue operating throughout the state, including at a site in Southern California where a CDE investigation in August 2018 revealed that staff used excessive force in

restraining two students, causing contusions and requiring emergency room treatment. https://www.disabilityrightsca.org/system/files/file-attachments/Restraint_and_Seclusion_Report.pdf at 3.

102. In the face of repeated reports and warnings regarding excessive restraint use from multiple sources—child and disability advocates, the U.S. DOE, and private citizens—TORLAKSON and the CDE did not strengthen the CDE's policies and practices. They did not implement procedures or practices to actively and more effectively monitor a dangerous practice that they knew was disproportionately impacting students with disabilities, particularly those at nonpublic schools. Nor did they implement effective compliance policies and practices. Rather, the CDE. SSPI and TORLAKSON continued to certify nonpublic schools such as GHS, including those with known records of restraint abuse, thereby sending a message to all nonpublic schools that restraint abuse did not concern the CDE, the SSPI or TORLAKSON. The CDE, SSPI and TORLAKSON were deliberately indifferent to the fact that children with disabilities were being disproportionately harmed by restraint use.

103. In 2003, a mother of a former GHS student sued the school and Sacramento Unified School District after GHS staff restrained her ten to thirteen times throughout one day in June 2002. *See* **Attachment F**. The student was anxious about her mother's planned surgery that day and repeatedly asked to call her mother, but GHS staff refused. When she became agitated, GHS performed "take down" maneuvers on the student and put her in multiple violent restraints. When the student vomited, staff made her clean it up. Plaintiffs allege on information and belief that the CDE knew of the facts alleged in the lawsuit.

104. Plaintiffs allege on information and belief that the CDE had cited GHS and requested corrective actions for improper teacher credentialing in August 2018 and that the school had until December 2018 to resolve the issues.

105. On November 6, 2018, Plaintiff STARK filed a compliance complaint with the CDE against Guiding Hands School, alerting it to the fact that her nine-year-old son, Plaintiff M.S., had been improperly restrained and injured at least twice during his first two months at the school. In response, the CDE did not immediately conduct an onsite visit. In fact, it did not visit GHS until more than three weeks later, on November 30, 2018, and only after another student, Max Benson, had been fatally restrained by GHS staff on November 28, 2018. **Attachment G** is a copy of the CDE's Investigation Report of STARK's complaint regarding the non-compliance of EGUSD.

**Attachment H** is a copy of the CDE's Nonpublic School Investigation Report of STARK's complaint with M.S.'s name and identifying information redacted.

106. When the CDE finally conducted its investigation of STARK's complaint, it found that from September 10 through November 29, 2018, GHS staff placed M.S. in restraints or otherwise "physically intervened" with him 61 times. **Attachment H** at 5, 10. After STARK filed her complaint with CDE, but before CDE conducted an on-site visit on November 30, 2018, GHS staff restrained M.S. at least two more times on November 29. **Attachment H** at 10. And Max Benson was killed by GHS staff who put him in a prone restraint for over an hour and a half on November 28, 2018.

107. During the November 30, 2018, on-site visit, the CDE learned that GHS staff regularly restrained students for lengthy periods of time in response to predictable, disability-related behavior that did not pose a clear and present danger to the physical health and safety of the students or others; that GHS staff had not been properly trained on how and when to use restraints legally and safely; and that GHS staff and administrators did not view their dangerous and abusive use of restraints as problematic or unsafe for GHS students. Yet the CDE and Torlakson did not take immediate action to prevent the GHS staff involved in the incident from having access to students at GHS. Nor did Torlakson or the CDE ensure that all GHS staff immediately receive competent training so that they would not continue to place students in dangerous and harmful restraints and would better understand their legal obligations.

108. Despite the serious risks involved, the CDE and Torlakson did not suspend GHS's license until December 5, 2018, an action that only prohibited GHS from admitting new students but did not prevent GHS or its staff from continuing to abuse current students. The CDE did not revoke GHS's certification until January 11, 2019. Between November 30, 2018, and January 11, 2019, GHS staff continued to restrain and physically discipline students as a matter of course, as evidenced by a letter sent to the CDE by the Western Placer Unified School District on December 6, 2018. **Attachment I** is a true and correct copy of a document produced to Plaintiffs by the CDE in response to a public records act request.

109. Despite the known risks and serious harm to children with disabilities, the CDE and Torlakson failed their duties to monitor, investigate, or ensure that nonpublic schools complied with anti-discrimination laws and those protecting students with disabilities from abusive restraint use. As a result, nonpublic schools like GHS continued to use such restraints frequently, for lengthy periods of time, on students whose disabilities elevated the risk of restraint use, and in

response to predictable, disability-related behaviors that did not constitute an immediate or serious threat to the student or others. Many students, including the Plaintiff Students, consequently suffered physical and emotional injuries.

**PLAINTIFF STUDENT M.S.**

110. M.S. , at all times relevant herein, was a minor with autism spectrum disorder, Tourette syndrome and ADHD at all times relevant to this complaint.

111. Doug PHILLIPS was at all times relevant to the complaint the Director of Special Education for EGUSD and the EG SELPA and therefore responsible for ensuring that all EG SELPA programs—including nonpublic schools in which EG SELPA students are placed—comply with state and federal special education and anti-discrimination laws Cal. Ed. Code § 56205(a) and (c).

112. Marilyn DELGADO was the EGUSD program specialist assigned to M.S.

113. M.S. was placed at GHS by Defendants EGUSD and EG SELPA. At the time, EG SELPA had a Master Contract with GHS to provide special education and related services to EG SELPA students.

114. M.S. had an IEP on May 30, 2018, while he was attending Zehnder Ranch Elementary School. Shortly thereafter that IEP, M.S.'s mother requested an emergency IEP meeting because a teacher at Zehnder Ranch dug her nails into M.S.'s arm and yanked his headphones off of his head. STARK discussed options with DELGADO, and they decided to look into GHS.

115. When STARK and DELGADO visited GHS, its Defendant MEYERS promoted the school's benefits, including their ability to work with STARK and M.S. on his behavioral issues. MEYERS told STARK that GHS used positive reinforcements and occupational therapy methods to prevent problematic behavior. STARK was concerned about the use of restraints and asked about GHS's policy. MEYERS told STARK that restraints were used as a last resort, only after other interventions had been unsuccessful and to protect the safety of the student or others. At no time did anyone from GHS disclose to STARK that GHS had a policy and practice of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to the students' or others' safety and that could have been addressed through the less restrictive measures in the students' BIPs.

116. M.S.'s IEP was amended on August 23, 2018, and he had a BIP dated August 27, 2018. The documents from the May 30, 2018, IEP stated that M.S. had "demonstrated possible

sensory issues such as sensory seeking resulting from poor interpersonal boundaries and . . . requires earmuffs occasionally due to a sensitivity to sounds." The BIP stated that M.S. "is sensitive to physical touch and proximity, staff will refrain from utilizing physical gestures or prompting when communicating with the student."

117. The BIP stated that M.S. could become physically aggressive when frustrated or doing something he did not like, resulting in his hitting or kicking peers or staff. The BIP required the use of an incentive system; routines; consistency and follow-through with expectations; model relaxation techniques (including deep breathing, taking space and squeezing M.S.'s fists); discussing events, consequences and restitution while practicing self-advocacy skills; offering choices; setting clear limits; counseling; and the utilization of verbal and visual prompting. It stated that M.S. should be allowed to access headphones when needed.

118. The Discipline/Emergency Intervention section stated that a "Nonviolent Physical Crisis Intervention" team would "maintain a calm and neutral tone, utilize clear/direct/simple verbal communication" and that because M.S. was sensitive to proximity, he would be provided with space to calm down and given headphones when escalated to help with calming.

119. The BIP also stated that because M.S. was sensitive to touch and proximity, GHS staff would use visual and verbal prompts and guidance and refrain from using physical prompts to communicate with M.S.

120. M.S. started school on September 10, 2018, when he was 9 years old.

121. STARK was given a GHS intervention statement form, which she signed on September 10, 2018. The form stated that "if children appear to be a physical danger to themselves or others around them a HWC trained staff will initiate a restraint in an attempt to de-escalate and enable appropriate re-entry into the classroom."

122. Defendants also provided STARK with the GHS enrollment materials, which included the GHS Parent and Student Handbook 2018-2019. The Handbook contains a section on Positive Behavior Interventions and Supports. Via the Handbook, GHS represented to STARK that the school was focused on positive behavior intervention and supports, as opposed to punitive, physical discipline. It stated that the school used "proactive" and "customized practices to support student behavior;" coaching, teaching and modeling positive interactions; "problem-solving;" "positive language;" and "direct teaching." It stated that GHS staff's corrections of undesirable behavior would be "Calm, Brief, Immediate, Respectful."

123. The GHS Handbook stated that corrections would involve a sequence that includes prompts, redirection, re-teaching, and providing a choice (which includes asking for help, moving to a different location, or taking a break). STARK was not told that, in lieu of the strategies outlined in GHS enrollment materials and M.S.'s BIP, GHS staff would restrain M.S. almost daily in response to his predictable, disability-related behavior.

124. GHS staff began to restrain M.S. on his first day of school. A belated CDE investigation found that between September 10, 2018, and November 6, 2018, GHS staff restrained or physically intervened with M.S. 61 times. On many days, M.S. was restrained on multiple occasions and for time periods in excess of 30 minutes. He regularly came home complaining of pain, with bruises, welts and abrasions on his face and body. M.S. was frequently placed in restraints in response to "noncompliant" behavior. Although she had not received training in HWC restraints, M.S.'s classroom teacher, Defendant Linda STEARN, participated in the great majority of the restraints on M.S. Other GHS staff, including WOHLWEND, DILLON, LAYMON, HINDS, ROMANO, SCHUMANN, MEYERS, CHRISTENSON, NARAN and JONES, also participated in and/or witnessed some of the restraints and/or took no action to protect M.S. from assault.

125. GHS staff did not regularly allow M.S. to use his noise-cancelling headphones when agitated, as required by his BIP. In at least one occasion on September 12, 2018, GHS removed M.S.'s noise cancelling headphones, causing him to yell, hit, kick and pinch the aid. Staff placed him in a standing restraint. When STARK picked M.S. from school that day, he had bruises on his face and arm. When asked, GHS staff told STARK that they had restrained M.S. STARK then spoke with principal MEYERS who represented that the staff was new and would be given "additional training" so that it would not happen again. MEYERS did not disclose that STEARN, M.S.'s teacher, had not received any training regarding restraints.

126. On September 17, 2018, STARK requested an IEP team meeting based on her concerns about "the amount and intensity of physical restraints being used" on M.S., as well as the injuries he had suffered.

127. At an IEP team meeting held on September 26, 2018, STARK told DELGADO and GHS staff that she was concerned about the facial abrasions on M.S. and how the emergency interventions were being implemented. When STARK asked for more information about the restraints, GHS staff described them with soft language and did not provide information about prone restraints. STARK stressed that M.S. did not like to be touched and that he alone must remove

his headphones. Nonetheless, GHS staff continued to substitute the techniques outlined in M.S.'s BIP, instead restraining him and using other physical interventions. Subsequent to the September 26, 2018, meeting, GHS completed 15 BERs for M.S. from October 2 to November 29, 2018. DELGADO, EGUSD and EG SELPA took no action to stop the illegal and excessive restraints or to ensure that GHS staff followed M.S.'s BIP.

128. Concerned about the number and nature of these continuing restraints and other physical interventions, STARK filed a compliance complaint with the CDE on November 6, 2018, which she forwarded to DELGADO on November 9, 2018. Her email stated that she was very concerned about the number of BERs that had been made since her son's start at GHS two months prior. "I am very concerned that these restraints are being used as corporal punishment and not as a safety measure."

129. DELGADO did not respond until November 16, 2018, the date of a meeting with the IEP team which had to be re-scheduled to December 5, 2018 because of forest fires in the area. DELGADO asked STARK to re-send the complaint attached to the email as she could not open it a second time. On November 26, 2018, STARK re-sent the attachment. DELGADO took no action.

130. Pursuant to the Master Contract between EGUSD, EG SELPA and GHS, GHS was required to complete a detailed behavioral emergency report ("BER") every time an emergency intervention was used against an Elk Grove student, place the BER in the student's file, and submit the BER to EGUSD within 24 hours of the incident "for administrative action." Under the Master Contract and Cal. Ed. Code § 56521.1(h), a BER demonstrating that "a previously designed intervention is ineffective" requires the review of the IEP team. Although GHS did not always fill out BERs completely or even at all for its physical interventions with M.S., the CDE's investigation of STARK's complaint included a review of 18 BERs filed for M.S. The CDE found that GHS had implemented restraints and other "physical interventions" on M.S. "61 times between September 10 and November 6, 2018."

131. Despite receiving information that GHS was improperly restraining M.S. as a substitute for the techniques prescribed in his BIP, no one at EGUSD/EG SELPA took action. Nor did the CDE visit GHS or begin its investigation until after the incident in which GHS staff restrained and killed Max Benson on November 28, 2018.

132. None of the GHS Defendants, the LEAs or the CDE informed STARK about the November 28, 2018, incident involving Max Benson.

133. M.S.'s IEP team held an approximately three-hour-long meeting on December 5, 2018, attended by DELGADO, STARK, GHS Administrators CHRISTENSON and RAMSEY, GHS behaviorist Sandra ROMANO, STEARN and others. STARK asked the team about "physical prompts" and restraints at GHS. STARK told the team that due to M.S.'s sensitivity to physical touch, she did not want them to use physical prompts with him. GHS team members told her that if they could not use "physical prompts," they would need to use more restraints on M.S. On this occasion as on others, GHS staff falsely represented to STARK that the restraints they were performing on M.S. were legal and justified. DELGADO did not question or contradict these representations. STARK left the meeting unsettled and said she needed to speak with an attorney.

134. On December 6, 2018, when STARK arrived at the school to pick up her son, she found a news crew. When asked by STARK, GHS administrator RAMSEY told her that a GHS student had died following a restraint but emphasized that GHS always followed the law. STARK removed her son from GHS that day and informed EGUSD that she would no longer send M.S. to the school.

135. The CDE finally conducted an investigation into STARK's complaint after Max Benson died. In its investigation report, the CDE made the following findings and conclusions regarding GHS:

- GHS violated Cal. Ed. Code § 56521.1 by using emergency interventions for predictable behavior; using emergency interventions as a substitute for M.S.'s BIP; failing to implement M.S.'s IEP; and failing to request an IEP team meeting to address M.S.'s behavior and placement at GHS given the continuous use of restraints;
- M.S.'s classroom teacherwas not included in a list of staff trained in HWC restraints, even though she had restrained M.S. on many occasions;
- GHS did not document M.S.'s injuries and failed to complete BERs as required;
- The conduct of GHS in its operation was "harmful to the health, welfare, and safety of the student with exceptional needs," in violation of Cal. Ed. Code § 56366.4(a)(3); and
- "GHS's routine and ongoing use of HWC restraints in response to the known behaviors in the student's BIP, such as hitting and kicking, rather than the implementation of the behavior strategies in the student's BIP violated [Cal. Ed. Code] Section 56521.1(a) and (b). Such practice of excessive, prolong restraint

by GHS is harmful to students because the practice is punitive, humiliating, can cause serious injury, does not provide an opportunity for de-escalation, can cause physical and mental stress, may cause difficulty breathing, can trigger underlying medical issues, and may create long-term trauma."

136. The CDE revoked GHS's NPS certification on January 11, 2019.

137. The CDE also investigated the actions and omissions of EGUSD, EG SELPA and their employees with respect to M.S.'s placement at GHS. In its investigation report, **Attachment G** to the complaint, the CDE made the following findings and conclusions:

- "The District failed to meet the requirements of [Cal. Ed. Code §] 56521.1(a). The District did not ensure emergency interventions were only used to control unpredictable, spontaneous behaviors, with clear and present danger and failed to use the less restrictive interventions which could have resolved the student's behaviors. The District physically intervened with the student 61 times from September 10 to November 6, 2018. **The District is out of compliance**."
- "The District failed to meet the requirements of [Cal. Ed. Code §] 56521.1(h). The District's reports described a serious behavioral incident on October 24, 2018, for which the BIP was ineffective. The District should have called an IEP meeting to review the incident and the BIP and determine whether there was a need to modify the BIP. **The District is out of compliance**."

138. As a result of the CDE's findings and conclusions, the CDE required that EGUSD make the following corrective actions, among others:

- Conduct a training for parents of EGUSD students attending GHS pursuant to their IEP. The training was to include a discussion and demonstration of all physical interventions used by the school;
- Submit evidence to the CDE that the District has reviewed the requirements of 34 C.F.R. § 300.325 and Cal. Ed. Code § 56383 regarding the District's role in relation to IEPs for students the District has placed at an NPS;
- Hold IEPs for District students who attended GHS and implement a BIP or revise the BIPs of students where necessary, focusing on the use of positive behavioral supports and interventions;
- Review the process for evaluating the placement and progress of each student placed at an NPS, focusing on whether the NPS appropriately implements the

student's BIP and whether the NPS complies with the requirements of Cal. Ed. Code §§ 56520 through 56525 regarding emergency behavioral interventions, and then revise the District's Master Contract as necessary; and

- Schedule onsite review of GHS to occur at least every other month for a year, focusing on whether District students' needs continue to be best met at the NPS.

139. EGUSD, EG SELPA, PHILLIPS and DELGADO abdicated their responsibilities to monitor and supervise the NPS placements of District students and ensure the NPS's compliance with state and federal laws prohibiting discrimination and the improper use of restraints. Defendants were deliberately indifferent in the face of knowledge that a District student was being repeatedly restrained in response to predictable, disability-related behavior that should have been addressed by his BIP and that did not constitute a clear and present danger to his or others' safety. They took no action and permitted the abuse and discrimination to continue.

140. The LEA and CDE Defendants failed to carry out their duties to supervise, train, investigate, report, and ensure legal compliance in response to known and suspected uses of excessive force against M.S. and other students at GHS.

141. In addition to his physical injuries described above, Defendants' actions and failures to act have caused M.S. to suffer extreme emotional distress, including post-traumatic stress disorder. He has difficulty sleeping and is plagued by night terrors. M.S. startles easily and has become more reclusive. He also has chronic wrist pain.

142. Defendants' actions and failures to act caused emotional distress to M.S.'s mother, STARK. STARK has difficulty sleeping and regularly agonizes over having agreed to his placement at GHS and not removing him sooner

143. At all times relevant to the complaint, the employees of EGUSD, EG SELPA, and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

**PLAINTIFF STUDENT ERIC DARROUGH**

144. ERIC, at all times relevant herein, was a minor with autism spectrum disorder and post-traumatic stress disorder. At all times relevant to the complaint, he was a student within the FCUSD and FC SELPA. After ERIC's family moved to Rancho Cordoba in late 2016, ERIC was placed at GHS by FCUSD via his IEP.

145. Bethanee Hunnicut (HUNNICUT) was a Program Specialist for the Special Education Department of FCUSD. In December 2016, HUNNICUT took ERIC's mother COUGHLIN and father DARROUGH to tour three possible schools, including GHS. COUGHLIN chose a different school for ERIC. The Friday before ERIC was scheduled to start at the other school, COUGHLIN was told that there was no longer room for ERIC and pressured by HUNNICUT to place ERIC at GHS or risk violating truancy laws. At no time during the tour or prior to ERIC's enrollment did anyone from GHS disclose to COUGHLIN or DARROUGH that GHS had a policy and practice of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to the students' or others' safety and that could have been addressed through the less restrictive measures in the students' BIPs.

146. Prior to ERIC's first day at GHS, the school had been informed that ERIC had lost most of his vocal abilities, had difficulty with transitions, and exhibited impulsive behavior. ERIC had never been restrained before his enrollment at GHS and did not require restraints to control his behavior. ERIC's parents never imagined nor would they have consented to ERIC's being restrained. ERIC's parents expected that his educational services would be provided by trained and compassionate staff.

147. On January 10, 2017, ERIC's first and only day at GHS, staff told ERIC to sit down. As it was his first day in a new school, ERIC was overwhelmed and experiencing anxiety due to the transition. ERIC reacted by impulsively swiping everything off of his desk. Rather than redirecting or prompting ERIC, staff immediately placed ERIC in a prone restraint for approximately 40 minutes, injuring his face, shoulders, neck, back, and wrists. Layers of skin were scraped off of ERIC's chin leaving an open wound, and he had bruises, swelling and marks from broken blood vessels on his eyes, face, neck, back, shoulder, torso, and wrists. Plaintiffs allege on information and belief that ERIC suffered a blow to the head during the restraint. When ERIC was dropped at home by the school van that afternoon, he looked as if he had been in a car accident.

148. COUGHLIN immediately contacted HUNNICUT by email to tell her about the restraint and ERIC's injuries. HUNNICUT told COUGHLIN she would handle the issue with GHS via FCUSD.

149. COUGHLIN and ERIC's father DARROUGH refused to send ERIC back to GHS, yet they had to fight with FCUSD for two to three months before the District would place ERIC at a different school.

150. In addition to the physical injuries to ERIC caused by the restraint, ERIC suffered significant emotional distress and related injuries. ERIC shows classic symptoms of Post-Traumatic Stress Disorder, as well as symptoms of traumatic brain injury, for which he takes prescription medication. Since the restraint, ERIC has more difficulty accomplishing tasks that were previously easy for him, resulting in frustration and angry outbursts. ERIC now suffers from short-term memory loss and an inability to bridge information from his memory to the present time. ERIC has lost previously acquired skills, such as communication skills and recognizing and naming colors. ERIC struggles much more with academics than prior to the restraint. He has trouble sleeping and often wakes with startles, disrupting his sleep pattern and making his other physical and mental health issues worse.

151. As a result of what happened at GHS, COUGHLIN and DARROUGH suffered from severe emotional distress and related injuries. DARROUGH now suffers from depression and COUGHLIN has difficulty trusting anyone.

152. At all times relevant to the complaint, the employees of FCUSD, FC SELPA, and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

**PLAINTIFF STUDENT DOMINIC ZUCOLLOTOO**

153. DOMINIC, at all times relevant herein, was a minor student with autism, OCD and Bipolar Disorder. D.S. was placed at GHS by FCUSD and FC SELPA via an IEP conducted on April 25, 2017. DOMINIC started at GHS on May 1, 2017, and remained there until moving to a different nonpublic school on October 22, 2018, at the request of his mother, KINSER. TRIGUERO was DOMINIC's program specialist and her supervisor, MAGEE, was a special education program coordinator for FCUSD and FC SELPA. BARBER was also a program specialist for DOMINIC at FCUSD who shares in the liability for the abuse of DOMINIC by participating in, acquiescing to and/or failing to prevent the abuse of DOMINIC

154. At or around the time of DOMINIC's enrollment at GHS, GHS administrator CHRISTENSON represented to KINSER that DOMINIC would benefit from attending GHS because they had a high staff-to-student ratio and offered small group and individual instruction, obviating the need for a one-to-one aide. CHRISTENSON said DOMINIC would be supervised during unstructured time and would receive visual and positive behavioral supports and self-regulation strategies. CHRISTENSON told KINSER that "Handle With Care" restraints were performed only by staff that had been trained and licensed to perform restraints and only as a last

resort measure when all the strategies in the BIP had been exhausted and/or when the student or others were in danger. KINSER asked what the restraints looked like, and CHRISTENSON demonstrated only a standing restraint, but told KINSER nothing about prone restraints. KINSER told GHS that she wanted it documented that restraints should only be performed on DOMINIC in an emergency situation and Defendants promised her they would put a note in DOMINIC's file. No one from GHS told KINSER that GHS had a policy and practice of regularly restraining students in lieu of using the positive behavioral interventions in the students' BIPs and in response to behavior that did not constitute a clear and present danger to the safety of the student or others.

155. While DOMINIC was at GHS, staff repeatedly placed him in restraints for predictable, disability-related behavior that was supposed to be addressed by the techniques in his BIP and which did not constitute a clear and present danger to the safety of DOMINIC or others. In many cases, staff caused DOMINIC to become aggravated by ignoring him or reacting inappropriately to known symptoms of DOMINIC's disability—such as giving fist bumps—and then placed him in excessive and violent restraints.

156. Because GHS did not always complete the required Behavioral Emergency Reports when staff restrained DOMINIC, Plaintiffs do not know the dates and circumstances for every restraint, but they began as early as October 4, 2017, and lasted until at least October 11, 2018. The GHS staff involved in illegally restraining DOMINIC were his classroom teacher Defendant MCCOY, his Special Education Teacher TRAPANI and other staff, including CHRISTENSON, OEHRING, GODBOUT, MATLOCK, CHAMBERS, GATEWOOD, DORMAN, LYONS, LOPEZ, BROUSSARD, COSTIN and ALLEN. DOMINIC was regularly placed in prone restraints, often multiple times a day, frequently lasting in excess of 30 minutes.

157. Beginning as early as October 4, 2017, FCUSD and FC SELPA received BERs for some but not all of the restraints (approximately 28 over a one-year period), most of which indicated that DOMINIC's behavior was predictable and did not constitute a clear and present threat to D.Z's or others' safety and should have been addressed by the less restrictive methods in his BIP. Yet FCUSD and FC SELPA employees allowed the illegal restraints to continue.

158. KINSER witnessed several of the restraints and was shocked by the excessive force used by staff, who would hold her son face down on the floor with either an elbow or knee pressing down on DOMINIC's upper back and pushing his chest into the cement or floor. The restraints reminded KINSER of how police restrain criminals. On multiple occasions, KINSER could see that DOMINIC was struggling to breathe. KINSER was told by GHS staff and administrators that

these restraints were legal, justified and the only way to control DOMINIC's behavior and keep him safe. However, KINSER became increasingly worried when DOMINIC started coming home with injuries to his back and chest and began to demand that GHS provide her with copies of legally required BERs.

159. DOMINIC suffered superficial soft tissue injuries such as red, weeping marks on his back and wrists, and reported that his ribs and arms hurt often. He often came home with abrasions, bruises and red welts across his back, shoulders and wrists. In addition, GHS staff regularly put DOMINIC in a mechanical restraint during transportation from school which involved tying his hands behind his back and using a harness that was several sizes too small. On several occasions, these mechanical restraints left welts and bruises on DOMINIC

160. On or around April 28, 2018, GHS staff placed DOMINIC in a mechanical restraint and tied his hands behind his back for his hour-long bus ride home. KINSER was so concerned that she took photos of the red welts all over DOMINIC's torso and the bluish tint of his hands. Shortly thereafter, KINSER requested an IEP team meeting because she was concerned about GHS's use of restraints. An IEP meeting was held on May 17, 2018, and attended by GHS administrator Phyllis Ramsey, GHS behaviorist ROMANO, and an FCUSD Program Specialist. Despite clear evidence in DOMINIC's educational records that he was being restrained illegally in response to predictable, disability-related behavior that did not constitute a threat to DOMINIC or others, Defendants decided to make no changes to DOMINIC's IEP, and FCUSD's program specialist took no action.

161. During the month of September 2018, GHS staff placed DOMINIC in at least six prone restraints, including one on September 17, 2018, that lasted over an hour; one on September 18, 2018, that lasted for two and a quarter hours and involved five staff members (McCOY, GODBOUT, MATLOCK, CHAMBERS and OEHRING) and another student; and one on September 19, 2018 that lasted an hour and a half.

162. On September 18, 2018, KINSER received a call from GHS telling her that they could not manage DOMINIC and that she needed to pick him up. When KINSER arrived, CHAMBERS and another staff member spent ten minutes speaking with her about DOMINIC's "mental health issues" before CHAMBERS asked KINSER whether she wanted to see DOMINIC so she could calm him down. KINSER was shocked and asked why CHAMBERS had delayed her with conversation while her son was upset. CHAMBERS took KINSER down the hall, where she saw DOMINIC being held in a prone restraint with one person at each arm and one person at each

leg, including another student. KINSER could see and hear that DOMINIC's breathing was labored and yelled at Defendants to get off of DOMINIC

163. On or around September 25, 2018, DOMINIC accidentally spilled the contents of a mug at his desk. CHAMBERS responded by placing his hand on DOMINIC's neck, pushing DOMINIC's face down into the desk, and pulling both of DOMINIC's arms behind him aggressively. CHAMBERS told DOMINIC to "shut the fuck up" and "clean this shit up."

164. On September 30, 2018, KINSER sent an email to CHRISTENSON in which she expressed concern that the school appeared to be "grossly understaffed". She requested that no more restraints be performed on DOMINIC "These are improper restraints, and I am still pretty shocked that a peer was told to restrain him. If there is a situation where he is becoming physically aggressive I want to be called and I will remove him myself," she wrote.

165. On October 1, 2018, KINSER wrote to Betty Jo WESSINGER, Assistant Superintendent of Special Education for FCUSD and the Director of FC SELPA, about DOMINIC's placement at GHS:

> The placement is at this point not working. He is having increasing spells of violence and being held in restraints, which I believe are him reacting to certain elements in his environment. I am not in agreement with their behavioral tactics, the meeting of his IEP, transportation needs and physical environment. Both my sons teacher and the teacher's aide, quit recently. I don't think their staffing is appropriate. I believe this school met his needs at one time, but no longer meets his needs now. Due to changes in my son, but also changes to their staff and methods.

166. KINSER asked that the appropriateness of DOMINIC's placement be discussed at his upcoming IEP meeting on October 18, 2018. WESSINGER responded to KINSER's email on October 2, 2018, including Defendants TRIGUERO and MAGEE to confirm their attendance at the IEP. WESSINGER added, "In the meantime, I will follow up with Guiding Hands on their staffing of the program."

167. As Assistant Superintendent of Special Education for FCUSD and the Director of FC SELPA, WESSINGER was responsible for administering the local plan and assuring that the SELPA was in compliance with all laws and regulations. Cal. Ed. Code § 56205(a) and (c); Folsom Cordova Unified School District Special Education Local Plan Area Local Education Agency (LEA) Assurances ("FC Assurances").

168. She was also responsible for: coordinating review of the SELPA Plan's programs, evaluating the Plan's effectiveness, and evaluating the effectiveness of the Plan's accountability methods; ensuring a coordinated system of data collection and management; assuring full educational opportunity; and administering the allocation of state and federal funds. As the SELPA Director, WESSINGER was also responsible for compliance with Cal. Ed. Code § 56195.7(c)(6), requiring LEAs to provide ongoing review of the SELPA's programs and procedures, as well as a method for correcting identified problems.

169. FCUSD and FC SELPA attested in their LEA Assurances:

The state has in place a system for review of the special education programs in districts. It is the responsibility of Folsom Cordova Unified SELPA to support the delivery of effective programs and services in FCUSD, to support a continuum of appropriate service options, to improve the quality of the programs offered, and to participate in review processes, including the Quality Assurance Process, Self Reviews, Verification Reviews, and Focused Monitoring, as well as Complaints processes and mediation and due process procedures. Folsom Cordova Unified SELPA shall ensure that any non-compliant items identified have been and continue to be rectified.

170. As FC SELPA's Director, WESSINGER had a duty to monitor and insure that its programs—including a nonpublic school in which FCUSD had placed a District student—were complying with state and federal education and anti-discrimination laws, including those restricting behavioral interventions. WESSINGER knew both from her position as the director of FC SELPA (see section regarding ERIC above) and her previous experience as the director of special education at Rocklin Unified School District (see section regarding AUSTIN PETERSEN below) that GHS regularly restrained students in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of the students or others and that could have been handled with less restrictive measures. Yet WESSINGER approved the use of GHS as a nonpublic school at which FCUSD could place its students with disabilities.

171. TRIGUERO was a Program Specialist and her supervisor, MAGEE, was a Special Education Program Coordinator. Both were directly involved in and responsible for monitoring DOMINIC's placement and ensuring that GHS was following state and federal law, including in its use of behavioral interventions. Both learned during DOMINIC's placement at GHS that he was being subjected to illegal restraints, yet neither took any action to stop the restraints or transfer DOMINIC to a safe placement until KINSER insisted that DOMINIC be removed from the school.

172. Prior to placing DOMINIC at GHS, FCUSD and FC SELPA already knew that GHS had improperly and aggressively restrained at least one student (Plaintiff Student ERIC), causing him serious physical and emotional injuries and prompting the parents to pull him out of the school. Additionally, FCUSD, FC SELPA and their employees received approximately twenty-eight BERs for the restraints GHS had placed on DOMINIC Those BERs demonstrated that GHS was restraining DOMINIC in response to predictable, disability-related behavior, in lieu of using the techniques specified in DOMINIC's BIP. Despite this information, FCUSD, FC SELPA, WESSINGER, TRIGUERO and MAGEE took no action to investigate GHS or to ensure that DOMINIC and other students were in a safe placement where they were not subject to abuse and discrimination.

173. Despite widespread knowledge among educators about the disproportionate use of restraints on students with disabilities and in nonpublic schools, FCUSD, FC SELPA WESSINGER, TRIGUERO and MAGEE failed to carry out their duties to supervise, train, investigate, report and ensure legal compliance in response to known and suspected uses of excessive force against ERIC, DOMINIC and other students at GHS. Defendants were deliberately indifferent to Plaintiffs' rights.

174. Plaintiffs allege on information and belief that even after receiving KINSER's email regarding the restraints and understaffing, WESSINGER did not "follow up" with GHS. Despite repeated complaints about the use of excessive and illegal restraints at GHS, Defendants took no action to monitor GHS, investigate complaints, stop the restraints, inform the CDE, or remove its students from an unsafe placement.

175. KINSER removed DOMINIC from GHS immediately following his IEP meeting on October 18, 2018.

176. In addition to the physical injuries described above, DOMINIC also suffered emotional distress and related injuries as a result of the restraints and other abuse to which Defendants subjected him. He suffers from depression and classic symptoms of Post-Traumatic Stress Disorder, including: retreating or assuming a defensive position if an adult reaches out toward him; toileting regression; disassociation; problems with sleeping, including night terrors and startles; and becoming triggered by loud noises.

177. Defendants' actions and failures to act caused KINSER severe emotional distress and related injuries. She became depressed as a result of watching her son suffer, knowing that he had been abused, feeling helpless to do anything about it, and witnessing the indifference of GHS

staff and administrators, as well as officials from FC SELPA and FCUSD. KINSER also suffered economic damages in the form of lost wages, as Defendants' actions caused her to miss work often in order to retrieve DOMINIC from the school and then later due to the PTSD that DOMINIC suffered as a result of Defendants' actions. As a result, KINSER's employer transitioned her from full-time to part-time work. When DOMINIC's PTSD prevented him from attending school, KINSER had to stay home so that she could care for DOMINIC and could no longer perform her job as required.

178. At all times relevant to the complaint, the employees of FCUSD, FC SELPA, and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

**PLAINTIFF STUDENT SEBASTIAN DAVIS**

179. SEBASTIAN, at all times relevant herein, was a minor student with depressive disorder, oppositional defiant disorder, developmental coordination disorder and post-traumatic stress disorder. On or about October 26, 2016, SEBASTIAN was placed at GHS via his IEP by Pollock Pines Elementary School District (PPESD) and the El Dorado County SELPA, of which PPESD is a member.

180. Defendant LICIA MCDONALD, was a school psychologist and the special needs coordinator at PPESD and recommended GHS to SEBASTIAN's father, Christopher DAVIS. She highlighted strong supervision, staff specifically trained to deal with behavioral issues, and a philosophy that valued inclusion and non-discrimination.

181. Prior to SEBASTIAN's enrollment at GHS, DAVIS visited the school and spoke with administrators by phone. GHS staff told DAVIS that the school's policy was to attempt to de-escalate students engaged in problematic behaviors with non-physical interventions, such as losing recess privileges or token economy points. GHS staff told DAVIS that students were restrained only if they were a danger to themselves or others. The restraints were described as standing restraints, and prone restraints were not described to DAVIS.

182. DAVIS also received a copy of the GHS Parent and Student Handbook, which misrepresented that the school was focused on positive behavior intervention and supports, as opposed to punitive, physical discipline.

183. At no time prior to SEBASTIAN's enrollment did GHS inform SEBASTIAN's father, Christopher DAVIS, that it had a policy and practice of disregarding the behavioral interventions outlined in students' IEPs and BIPs and instead restrained students in response to

predictable, disability-related behavior which did not constitute a clear and present danger to the safety of students or others and which could have been handled by less restrictive means.

184. GHS staff, including OXFORD, LYONS and CARR (and other yet-to-be-identified individuals), began regularly restraining SEBASTIAN on October 26, 2016 or earlier and continued to restrain and otherwise physically abuse him through November 2018. The restraints did not occur in response to clear and present dangers to the safety of SEBASTIAN or others but in response to predictable, disability-related behavior, including "non-compliance" and using profanity.

185. GHS did not, as legally required, complete BERs or notify DAVIS each time they restrained SEBASTIAN. Moreover, GHS staff and administrators represented to DAVIS that the restraints were legal, appropriate and necessary. As a result, Plaintiffs do not know all of the dates on which SEBASTIAN was restrained or the identities of the GHS staff involved. The GHS staff directly involved in restraining SEBASTIAN and/or witnessing the restraints without acting to protect SEBASTIAN include, but likely are not limited to, WOHLWEND, CHRISTENSON, SMITH, GATEWOOD, KELLER, Matt Carr ("CARR"), Ashley Oxford ("OXFORD"), and Julia Lyons ("LYONS").

186. GHS staff restrained SEBASTIAN for predictable, disability-related behavior that did not constitute a clear and present danger to SEBASTIAN or others, such as yelling or refusing to follow instructions. Not only did the restraints and other physical interventions fail to address SEBASTIAN's behavioral issues, they escalated the situation by frightening SEBASTIAN, causing him to resist physically and try to escape.

187. On or about September 27, 2017, SEBASTIAN's IEP team held his annual IEP meeting. The accompanying documentation contains the following statement from his teacher, OXFORD: "[SEBASTIAN] has had 12 Handle With Care incidents this school year. They occurred when he was excessively non-compliant, and then began yanking on staff's arms and dropping his weight when physically prompted. He is not overtly aggressive, but refused to be safe once released and attempts to elope." Defendant MCDONALD was SEBASTIAN's representative for PPESD, attended the meeting and signed the IEP documents containing the statement above. Although the restraints were, on their face, in violation of the Education Code § 56521.1 (a) and (b), MCDONALD did not object to the restraints. As a school psychologist, MCDONALD was a mandated reporter and therefore legally required to notify the authorities about the child abuse to which GHS had subjected SEBASTIAN Yet MCDONALD did not file a report of child abuse,

take any action to stop the restraints, insist on the use of positive behavioral interventions outlined in SEBASTIAN's BIP, investigate GHS, nor insure that SEBASTIAN was in a safe placement.

188. In fact, prior to the IEP meeting, MCDONALD had prepared a Psycho-Educational Assessment Report on SEBASTIAN In it, she noted SEBASTIAN's behavioral problems, including non-compliance, lack of motivation, negativity and disorganization. In discussing SEBASTIAN's issues with "aggression," MCDONALD gave the following examples: "defies teachers, threatens to hurt others, teases others." There is nothing in the report indicating that SEBASTIAN had engaged in behavior that constituted a clear and present danger to the physical safety of SEBASTIAN or others. MCDONALD concluded in her report that SEBASTIAN's behavioral issues "require physical restraints." In essence, PPESD and MCDONALD approved the use of illegal restraints on SEBASTIAN by GHS.

189. On February 8, 2018, SEBASTIAN was picking up and throwing sticks and ignored staff demands that he stop. OXFORD grabbed SEBASTIAN, and SEBASTIAN responded by struggling and trying to escape. OXFORD then put SEBASTIAN in a more restrictive restraint. Plaintiffs allege on information and belief that GHS did not file a BER for this incident as is legally required. GHS staff falsely represented to DAVIS that their actions were legal, justified and necessary.

190. On or about May 18, 2018, SEBASTIAN was "struggling" with behavioral issues, so OXFORD called for GATEWOOD and CARR. GATEWOOD and CARR removed SEBASTIAN from the classroom and restrained him mechanically by placing a harness on him, pulling his hands behind his back and binding his arms with zip ties. The wounds on SEBASTIAN's wrists from the zip ties lasted for several weeks. Plaintiffs allege on information and belief GHS did not file a BER for this incident as legally required. GHS staff falsely represented to DAVIS that their actions were legal, justified and necessary.

191. On May 22, 2018, OXFORD restrained SEBASTIAN because he was not complying with her instructions and being disrespectful. When SEBASTIAN began to struggle in the restraint, OXFORD put him in a more restrictive restraint. SEBASTIAN continued to struggle and when he got loose from OXFORD, LYONS placed him in another restraint. Rather than calming SEBASTIAN, the restraints aggravated the situation, frightened and upset SEBASTIAN, and caused him to become aggressive. GHS staff placed him in yet another restraint to transport him from the classroom to the school bus at the end of the day. This is likely one of the many incidents where, as reported by SEBASTIAN, he was restrained by a "harness" device and zip ties

during transportation. Plaintiffs allege on information and belief GHS did not file a BER for this incident as legally required. GHS staff falsely represented to DAVIS that their actions were legal, justified and necessary.

192. On May 31, 2018, OXFORD reported to DAVIS that GHS had to restrain SEBASTIAN twice because he had "a negative peer interaction" and tried to run away from staff. Staff "grabbed" SEBASTIAN, which made him "aggressive," so they restrained him twice. Plaintiffs allege on information and belief that GHS did not file a BER for this incident as legally required. GHS staff falsely represented to DAVIS that their actions were legal, justified and necessary.

193. Although GHS frequently failed to complete legally required Behavior Emergency Reports, it was not keeping the restraints a secret from PPESD. GHS completed and sent a BER to PPESD and MCDONALD for at least one restraint incident, on August 13, 2018, in response to SEBASTIAN's non-compliance, refusing direction and using profanity.

194. On September 7, 2018, an IEP team held SEBASTIAN's annual IEP meeting, which was attended by DAVIS, WOHLWEND, CHRISTENSON, and MCDONALD. The documentation indicated that SEBASTIAN had been restrained in response to behavioral issues such as "non-compliance" or using profanity. GHS staff misrepresented to DAVIS that these restraints were legal, appropriate, and the only effective response to SEBASTIAN's behavioral issues. GHS gave DAVIS a "Behavior Emergency Plan"—not to be confused with a legally required Behavior Improvement Plan—which would authorize GHS to perform "Therapeutic Physical Intervention Techniques" on SEBASTIAN The form did not use the word "restraint" or describe the techniques, but it essentially sought authorization for the HWC restraints that GHS staff had been performing and would continue to perform on SEBASTIAN Neither GHS nor MCDONALD disclosed to DAVIS the excessive and illegal nature of the restraints.

195. Once again, although the restraints violated Education Code § 56521.1 (a) and (b), MCDONALD did not object to the restraints, file a child abuse report, insist on the use of positive behavioral interventions outlined in a BIP, investigate GHS, or insure that SEBASTIAN was in a safe placement. Rather, MCDONALD signed GHS's "Behavior Emergency Plan" and approved SEBASTIAN's continued placement at the school. MCDONALD was deliberately indifferent to the discrimination and abuse to which GHS and its staff were subjecting SEBASTIAN

196. On November 28, 2018, WOHLWEND and other GHS staff restrained SEBASTIAN's classmate, Max Benson, and killed him. Despite widespread media attention about

Max Benson's death, neither MCDONALD nor PPESD's Superintendent, Pat ATKINS, notified DAVIS about the incident or took any action to remove SEBASTIAN from the school and find him a safe placement. Rather, DAVIS pulled SEBASTIAN from the school on his own when he learned about what had happened in mid-December 2018.

197. During the following months, ATKINS and MCDONALD made little to no effort to find another placement for SEBASTIAN, who remained at home. Staff for the El Dorado County SELPA repeatedly asked MCDONALD and ATKINS where SEBASTIAN had been placed. On April 4, 2019, MCDONALD wrote to the SELPA offices apologizing for not finding a placement for SEBASTIAN: "Sorry for the delay on this! **I know we are out of compliance**, but this is a student we are having great difficulty finding an appropriate placement for. I'm working with our superintendent, Pat Atkins, to figure this out soon." Emphasis added.

198. PPESD finally placed SEBASTIAN at Sierra Ridge Elementary School. Although PPESD knew that SEBASTIAN's former teacher WOHLWEND had killed another GHS student by restraining him for almost two hours and that the CDE had subsequently revoked GHS's certification, PPESD hired WOHLWEND to be a special education teacher at Sierra Ridge. Neither MCDONALD, ATKINS nor anyone else from PPESD told DAVIS that WOHLWEND was working at Sierra Ridge before SEBASTIAN started at the school. When DAVIS found out, he had to specifically request that WOHLWEND have no contact with SEBASTIAN

199. As the Superintendent of PPESD, ATKINS was responsible for the policies, practices and procedures governing the provision of special education services in the District, including the monitoring and supervision of nonpublic schools in which District students had been placed, including school compliance with anti-discrimination laws and those prohibiting corporal punishment and restricting the use of behavioral interventions. Cal. Ed. Code §§ 56366(a)(2)(B), 56521.1, and 56523; 5 C.C.R. § 4960(a). ATKINS failed to carry out his duties to supervise, train, investigate, report and ensure legal compliance in response to known and suspected uses of excessive force against the Plaintiff Students at GHS. ATKINS also failed to train or supervise the PPESD staff who attended District IEPs and directly monitored the progress and placements of the District's special education students. PPESD's special education staff, including MCDONALD and ATKINS, knew that students were being subjected to illegal and discriminatory restraints at GHS but took no action and continued to approve an unsafe placement. In fact, MCDONALD approved the illegal restraints on SEBASTIAN ATKINS was so indifferent to the use of illegal

restraints on children with disabilities that he allowed PPESD to hire WOHLWEND as a special education teacher after she killed Max Benson.

200. Defendants knew that students with disabilities were being subjected to illegal restraints in response to their predictable, disability-related behavior, but they took no action because they did not want to provide the necessary educational services themselves or take the time, effort and/or expense necessary to ensure that SEBASTIAN and other students with disabilities were receiving their educational services in a placement where staff followed the law, engaged in positive behavioral interventions and did not subject students to excessive, harmful and illegal restraints. Defendants were deliberately indifferent to the rights of their students with disabilities, including SEBASTIAN, to be free from unreasonable restraints and disability-based discrimination.

201. In addition to the physical injuries described above, SEBASTIAN often came home with bruising, red welts, marks across his shoulders or arms and on his stomach, and wounds on his wrists, knees and chin. Defendants' actions and failures to act also caused SEBASTIAN severe emotional distress, related injuries and exacerbated disabilities stemming from previous trauma suffered by SEBASTIAN all known to Defendants. SEBASTIAN suffers from post-traumatic stress disorder and has difficulty sleeping. His behavior problems have gotten worse. SEBASTIAN has become angry and despondent, is easily frustrated, and frequently lashes out with physical violence in situations that did not previously generate such reactions.

202. Defendants' actions and failures to act have caused DAVIS to suffer emotional distress and related injuries. DAVIS has difficulty sleeping, with periods of insomnia and restless sleep. He experiences increased levels of separation anxiety when he is separated from SEBASTIAN DAVIS has experienced an increase in negative ruminations. He also has increased levels of social anxiety. DAVIS experiences anxiety when he and/or SEBASTIAN leave the house, so they do not linger in public spaces and try to return home as soon as possible.

203. At all times relevant to the complaint, the employees of PPESD, El Dorado County SELPA, and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

**PLAINTIFF STUDENT JAMES PERKINS**

204. JAMES, at all times relevant herein, was a minor with autism spectrum disorder, ADHD, and other emotional, sensory and mood disorders in the Amador County Unified School

District ("ACUSD"). He was placed at GHS by ACUSD, ACOE and ACOE SELPA via his IEP in 2013.

205. After JAMES eloped from Jackson Elementary School in 2013, he was suspended and his mother, Cherilyn CALER, was told that JAMES could not return. Defendant Mitzi FAULKNER, at that time the Special Education Coordinator for ACOE, contacted CALER and offered three possible schools, including GHS. CALER and FAULKNER toured the schools and selected GHS for JAMES. During their visit, GHS Principal MEYERS highlighted GHS's specialization in autism spectrum disorder, small classes, high staff member to student ratio (8-10 students with 2 staff members in the classroom at all times), staff highly trained to handle JAMES's known behaviors, and a policy of inclusion and non-discrimination. No one at GHS informed CALER that that GHS had a policy and practice of regularly physically restraining students in response to predictable, disability-related behavior that did not constitute a clear and present danger to their or others' safety and in lieu of the positive behavioral interventions listed in students' BIP.

206. As the Special Education Coordinator who placed JAMES at GHS, FAULKNER had a duty to investigate and monitor JAMES's placement and ensure that GHS and its staff followed state and federal anti-discrimination and education laws, including those prohibiting corporal punishment and limiting behavioral interventions. FAULKNER had a duty to ensure that JAMES received an education in a safe, non-discriminatory placement. FAULKNER failed to fulfill these duties owed to JAMES

207. As the Director of Special Education, Defendant BROWN, also had a duty to ensure that JAMES received an education in a safe, non-discriminatory placement. BROWN also failed to fulfill these duties owed to JAMES, which resulted in the harm to JAMES described herein.

208. When she became the SELPA Director, FAULKNER was responsible for the coordination of special education services and programs for students within ACUSD and for the implementation of the Local Plan in compliance with state and federal laws and regulations. FAULKNER was also responsible for the supervision and evaluation of personnel who provide special education services to ACUSD students and for assuring program compliance with state and federal law, including the programs and staffing at nonpublic schools at which ACUSD had placed its students via their IEPs. FAULKNER was also responsible for implementing master contracts with nonpublic schools, which include an agreement by the NPS to provide educational services to District students and comply with anti-discrimination and education laws in exchange for state and federal education funds.

209. GHS frequently failed to complete BERs or notify CALER, as required by law, when GHS staff restrained JAMES. Moreover, GHS staff assured CALER that all of the restraints were legal, appropriate and necessary to keep JAMES and others safe. As a result, Plaintiffs do not know all of the dates on which JAMES was restrained or otherwise physically abused by GHS, nor do they know the names of all individuals directly involved in the restraints. Defendants SMITH, ALLEN, CHAMBERS, MATLOCK and WOHLWEND were some, but not all, of the staff members who were directly involved in restraining JAMES

210. From 2013 to 2015, GHS did not provide CALER with any records regarding behavior incidents or restraints with JAMES, although on at least one occasion in 2015, GHS staff placed JAMES in a mechanical restraint (vest) because he did not want to get on the bus. GHS did not file a BER for this incident.

211. At JAMES's IEP in 2016, CALER requested that the school take measures to ensure that JAMES was not restrained by a male, as JAMES had significant trust issues with men.

212. Toward the end of 2016, according to the incomplete records Plaintiffs have been able to obtain, GHS staff began to repeatedly and continuously restrain JAMES in response to predictable, disability-related behavior which did not present a clear and present threat to JAMES's or others' safety and which should have been addressed by the less restrictive behavioral interventions in JAMES's BIP. Despite CALER's specific request to avoid restraints by men, JAMES was regularly restrained by male staff.

213. Starting as early as November 30, 2016, GHS frequently placed JAMES in lengthy restraints of 20-35 minutes in response to JAMES's kicking or hitting walls or furniture. Between January 5 and December 20, 2017, GHS staff restrained JAMES at least 14 times, usually in response to JAMES's kicking or hitting the walls or school furniture when he became frustrated. On February 22, 2017, GHS staff placed JAMES in a prone restraint on the classroom carpet after he ripped his spelling book, hit the wall and pulled on the window curtain. JAMES sustained carpet burns on the skin around his left eye. CALER had to take JAMES to urgent care when the wounds did not heal, and JAMES refused to go to school because he was embarrassed to face his peers.

214. After that incident, CALER told Defendant CHRISTENSON that she wanted to remove her consent to restraints from JAMES's file. CHRISTENSON responded that if CALER withdrew her consent to the Handle With Care restraints, JAMES could no longer attend GHS, as it was a required condition for attendance at GHS.

215. GHS staff, including JAMES's classroom teacher, Defendant WOHLWEND, continued to restrain JAMES in 2018 in response to predictable, disability-related behavior which did not present a clear and present threat to JAMES's or others' safety and which should have been addressed by the less-restrictive behavioral interventions in JAMES's BIP.

216. On November 28, 2018, another student in JAMES's classroom, Max Benson, was spitting. In response, WOHLWEND and other GHS staff placed Max in a prone restraint for almost two hours during which he struggled, urinated on himself, vomited, stopped breathing and went into cardiac arrest. JAMES was present in the classroom and witnessed Max struggling for his life and losing consciousness.

217. When CALER learned about Max Benson's death in early December 2018, she immediately removed JAMES from GHS.

218. Defendants SLAVENSKY and FAULKNER failed to ensure that GHS, a nonpublic school at which they had placed JAMES, complied with state and federal anti-discrimination and education laws, including those prohibiting corporal punishment and restricting the use of physical behavioral interventions. Defendants failed to ensure that JAMES received access to the benefits and advantages of educational programs and services available to non-disabled students in the district and did not supervise or ensure that ACUSD personnel providing services to JAMES met the requirements of state and federal law.

219. As an NPS which received state and federal education funds paid to ACUSD in exchange for providing education services to ACUSD students, GHS was a program of ACUSD. Defendants SLAVENSKY and FAULKNER failed to monitor or investigate GHS and its staff and ensure that they met the requirements of and complied with state and federal anti-discrimination and education laws and regulations. They failed to ensure that the program in which they had placed JAMES was safe, did not discriminate against him on the basis of his disability and did not improperly restrain or otherwise abuse JAMES Nor did SLAVENSKY or FAULKNER effectively delegate these duties to other ACUSD/ACOE staff.

220. The restraints in which the GHS Defendants placed JAMES caused physical injuries, including welts, red marks, bruising and abrasions on his face, shoulders, wrists, back and chest. JAMES also suffers from chronic back pain for which he sees a chiropractor.

221. In addition, being placed in repeated restraints and witnessing GHS staff restrain and ultimately kill Max Benson have caused JAMES to suffer extreme emotional distress and associated injuries. JAMES suffers from post-traumatic stress disorder symptoms and still talks

about how his teachers killed a fellow classmate. JAMES becomes easily disturbed, suffers from panic attacks and bouts of anxiety, and a loss of concentration. He is more defiant than previously with his parents and other adults, refusing to listen or follow simple orders.

222. Defendants' actions and failures to act have also caused CALER emotional injuries, including emotional distress and pervasive thoughts about the abuse to which Defendants subjected JAMES and distress at what happened to Max Benson. She thinks about how what happened to Max could have happened to JAMES and struggles with feelings of guilt that she failed her son and did not remove him sooner. CALER has more difficulty sleeping since JAMES's experience at GHS and must now take a sleep aid. She has constant anxiety over how JAMES is doing and whether he is safe at his current school.

223. At all times relevant to the complaint, the employees of ACUSD, ACOE, ACOE SELPA and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

**PLAINTIFF STUDENT HAYDEN KING**

224. HAYDEN, at all times relevant herein, was a minor with A.D.H.D., Generalized Anxiety Disorder, Disruptive Mood Dysregulation Disorder, Depression, and other neurodevelopmental disabilities. From 2017 through 2019, HAYDEN was a student within the Mother Lode Union School District ("MLUSD") and the Placerville Union School District ("PUSD"). He was placed at GHS in 2017 pursuant to his IEP and remained there until January 2019.

225. MLUSD Director of Special Education, Sunny Lofton, recommended GHS to HAYDEN's mother, Plaintiff Suzanne MULLER, and told her it was the "best" and only available option able to address HAYDEN's special education needs, including increased physical aggression at his previous school. GHS was billed as a nonpublic school "which focuses on supporting students with intensive needs in a highly therapeutic setting."

226. No one at GHS informed MULLER that GHS had a policy and practice of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to their or others' safety and that could have been addressed by less restrictive interventions outlined in students' BIPs. GHS staff began to restrain HAYDEN almost immediately after he started school, on January 17, 2017, and continued to restrain him until November 20, 2018 or later. GHS did not regularly complete a BER or notify HAYDEN's parents as required by law when HAYDEN was restrained. Moreover, GHS administrators and staff

repeatedly misrepresented to MULLER that all restraints were legal, appropriate and necessary to keep HAYDEN and other safe. As a result, Plaintiffs do not know the dates and circumstances for all of the instances in which GHS restrained HAYDEN However, records obtained from El Dorado County SELPA demonstrate that HAYDEN was restrained at least 18 times between January 2017 and January 2019.

227. GHS staff regularly placed HAYDEN in restraints, including prone restraints, in response to predictable, disability-related behaviors that did not pose a clear and present danger to HAYDEN or others and that could have been handled by less restrictive interventions. HAYDEN was restrained for behaviors such as non-compliance, throwing items, kicking furniture or squirming away from staff members. The restraints often involved staff members sitting or lying on top of HAYDEN, making it difficult for him to breathe, and holding his hands behind his back for so long that they lost feeling. Staff did not monitor HAYDEN's breathing or condition while holding him in a restraint; he often heard them chatting and having trivial conversations with one another while sitting on top of him.

228. HAYDEN was always terrified while a student at GHS. He felt that GHS's main goal was to induce fear in the students to make them compliant. Staff regularly threatened students that they could and would be restrained if they did anything considered "out of bounds" or "non-compliant."

229. HAYDEN left GHS in January 2019 when the CDE revoked the school's certification, and the school had to close.

230. The restraints caused physical injuries to HAYDEN, including bruising and abrasions to his chin and cheeks, and back and neck pain. Defendants' actions and failures to act also caused HAYDEN severe emotional distress and fear of abuse. HAYDEN is now hypersensitive to unexpected physical contact and to having things close to his face (as a result of having his face pressed down into mats during prone restraints). HAYDEN also becomes scared in crowded or loud places. For approximately one year after leaving GHS, HAYDEN had regular nightmares from which he would wake up shaking, in a cold sweat. HAYDEN is angry at his parents for allowing school officials to place him at GHS and for not realizing that HAYDEN was being abused at the school and immediately removing him.

231. Defendants' actions and failures to act have also caused emotional distress and associated injuries to Plaintiff MULLER, who feels extreme guilt about agreeing to HAYDEN's

placement at GHS and for not realizing that GHS staff were abusing HAYDEN and removing him from the school.

232. At all times relevant to the complaint, the employees of MLUSD, PUSD, and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

**PLAINTIFF STUDENT AUSTIN PETERSEN**

233. AUSTIN, at all times relevant herein, was a minor student with autism spectrum disorder who was placed at GHS by Rocklin Unified School District ("RUSD") via his IEP in September 2012 and remained there until approximately November 5, 2014.

234. Prior to agreeing to AUSTIN's placement at GHS, his mother, Suzanne Brent-Petersen, met with GHS principal MEYERS, who misrepresented to Ms. Brent-Petersen that: GHS and its staff had the experience and skills necessary to work with children with autism; restraints were used infrequently and only when a child was in immediate danger of harming himself or others; GHS was fenced in and otherwise able to handle AUSTIN's known behavior of walking away from school; and GHS had a high staff-to-student ratio and could provide adequate supervision. No one at GHS informed Ms. Brent-Petersen that GHS had a policy and practice of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to their or others' safety and that could have been addressed by less restrictive interventions.

235. GHS staff began restraining AUSTIN during his first week at GHS in the lunch room. AUSTIN tried to sit near the trash can, away from the other students, because he was nervous and did not know anyone. Staff told AUSTIN he could not sit there, so he started pacing while holding his tray and talking to himself. A staff member told AUSTIN to sit down, and when he refused, she grabbed his tray. Then two staff members placed him in a prone restraint, which shocked and frightened AUSTIN. When his mother later asked MEYERS why staff had restrained AUSTIN for nonviolent behavior, MEYERS responded that staff did not known know whether he had violent tendencies and that it would not happen again.

236. Nonetheless, GHS continued to place AUSTIN in restraints approximately once a month until he left GHS in November of 2014. GHS did not regularly complete a BER or notify AUSTIN's parents as required by law when AUSTIN was restrained. Moreover, GHS administrators and staff repeatedly misrepresented to AUSTIN's parents that all restraints were

legal, appropriate and necessary to keep AUSTIN and others safe. As a result, Plaintiffs do not know the dates and circumstances for all of the instances in which GHS restrained AUSTIN.

237. GHS staff regularly placed AUSTIN in restraints, including prone restraints, in response to predictable, disability-related behavior that did not pose a clear and present danger to AUSTIN or others and that could have been handled by less restrictive interventions. These restraints often lasted for long periods of time—from 15 minutes to over an hour. AUSTIN was regularly restrained for behavior such as failing to follow instructions, "non-compliance," being "aggressive," yelling, or getting into a verbal fight with a classmate. GHS staff regularly substituted restraints for the intervention strategies outlined in AUSTIN's BIP, even when AUSTIN would himself request the opportunity to practice a self-regulating technique, such as taking a break or removing himself from the classroom.

238. AUSTIN was restrained on numerous occasions for behavior that could not even reasonably be considered to be defiant, such as not immediately responding to an instruction because he did not hear or understand the teacher. On one occasion, staff restrained AUSTIN because he was arguing with a peer and "talking with his hands above his waist." In that instance, the argument had ended and AUSTIN was walking away when a teacher's aide purposely tripped AUSTIN, threw him onto the asphalt and laid on top of him, severely restricting AUSTIN's breathing.

239. GHS had a policy and practice of regularly restraining students to instill fear and compliance. When a new student arrived at the school, AUSTIN and his friends would speculate about how soon the new student would be restrained, which was almost always within the first week. Every time four staff members would come into a classroom, AUSTIN would tense up, knowing that someone was in trouble and about to be restrained—possibly him.

240. The supporting documents to AUSTIN's IEP in October 2012 include a Behavioral Report showing that from August 2012 to October 2012, GHS staff restrained AUSTIN twice, for "noncompliance" and for being "aggressive." The report states that the incidents leading to the restraints stemmed from "misunderstandings." This document understated the number of restraints in which GHS had placed AUSTIN. Nonetheless, the document was provided to an RUSD program specialist Robin Smay ("SMAY"), who took no action in response to information that GHS was restraining an RUSD student in response to predictable, disability-related behavior that did not constitute a clear and present danger to the physical safety of the student or others. SMAY approved AUSTIN's continued placement at GHS. At all times relevant to this complaint, SMAY

was an employee and/or agent of RUSD and was acting within the scope of her employment and/or agency.

241. The supporting documents to AUSTIN's IEP in May 2013 include a Behavioral Report showing that from August 2012 to April 2013, GHS staff restrained AUSTIN ten times, often for things like "becoming aggressive with staff" or "noncompliance". This document understated the number of restraints in which GHS had placed AUSTIN. Nonetheless, the document was provided to RUSD program specialist Karla Salvo ("SALVO"), who took no action in response to information that GHS was restraining an RUSD student in response to predictable, disability-related behavior that did not constitute a clear and present danger to the physical safety of the student or others. SALVO approved AUSTIN's continued placement at GHS. At all times relevant to this complaint, SALVO was an employee and/or agent of RUSD and was acting within the scope of her employment and/or agency.

242. The supporting documents to AUSTIN's IEP in May 2014 include a Behavioral Report showing that from August 2012 to April 2014, GHS staff restrained AUSTIN thirteen times, often for things like "yelling" or "noncompliance." These included two restraints over an hour long. This document understated the number of restraints in which GHS had placed AUSTIN. Nonetheless, the document was provided to RUSD program specialist Jenn Kaiser ("KAISER"), who took no action in response to information that GHS was restraining an RUSD student in response to predictable, disability-related behavior that did not constitute a clear and present danger to the physical safety of the student or others. KAISER approved AUSTIN's continued placement at GHS. At all times relevant to this complaint, KAISER was an employee and/or agent of RUSD and was acting within the scope of her employment and/or agency.

243. On or about November 5, 2014, GHS called Brent-Petersen and told her AUSTIN had brought a "weapon" to school and that GHS had called the police. In fact, AUSTIN had taken his favorite toy, a small hammer tool from an archaeology kit for children over five years old, to school. As AUSTIN lived in fear of being restrained, he showed the toy hammer to one of the aides early in the day to make sure it was okay. When the aide said the hammer was "cool," AUSTIN assumed it had been approved. Shortly thereafter that, AUSTIN's teacher Heidi Spiess walked out of his classroom and returned with four staff members, including Defendant CHRISTENSON, who stood over AUSTIN. AUSTIN thought that he was in trouble because his chair was not "four on the floor." When the staff members asked AUSTIN to give them "the weapon," AUSTIN told him he did not have a weapon before he realized what they meant. The staff patted AUSTIN down.

When AUSTIN refused to release the hammer because he knew that, like so many other things they had taken from him, he would not get it back, staff lifted him out of his chair and restrained him on the floor. AUSTIN heard his neck pop and his arm lost feeling. Staff kept AUSTIN face-up on the floor while a staff member laid over the top of him and other staff members held down each of his feet and hands. AUSTIN told the staff he couldn't breathe, but they ignored him. During the 20-minute restraint, staff also refused AUSTIN's request for water as they chatted with each other as if AUSTIN wasn't even there.

244. After receiving the call from the school, Brent-Petersen drove to the school and rang the doorbell. While waiting approximately two minutes for someone to open the door, Brent-Petersen heard muffled screams and crying coming from inside. When she entered the school, Brent-Petersen saw a small boy, approximately six to seven years old, face down on the ground with his arm sticking out from under a very large female staff member who was laying on him. The child was crying, but his voice was muffled and he appeared to be having difficulty breathing. At that moment, GHS principal MEYERS arrived and whisked Brent-Petersen into her office saying the incident was "none of [Brent-Petersen's] business."

245. Brent-Petersen begged MEYERS to stop the staff from restraining AUSTIN, as he was not a violent child. When MEYERS refused to confirm that GHS would no longer restrain AUSTIN, Brent-Petersen removed AUSTIN from the school.

246. Brent-Petersen reported the restraint on her son and what she had witnessed at GHS to the local sheriff, but never heard back. She also called RUSD and spoke with a program specialist to tell them AUSTIN would not be returning to GHS and described the restraint of the small child she had seen there. Brent-Petersen warned the staff member she spoke with that GHS was going to end up killing a student. The program specialist responded that they had been having so many problems with GHS that they would never send anyone there again.

247. On November 7, 2014, the RUSD program specialist made a child abuse report to CPS based on the restraint in which AUSTIN had been placed on November 5, 2014. The report noted that GHS staff had placed AUSTIN, a slim child with a height of 5 feet, 5 inches, in a four-person restraint in which his arms and legs were held down for 30 minutes.

248. AUSTIN's mother subsequently placed him at Placer Learning Center, where he remained for the following two and a half years. AUSTIN felt safe there when he witnessed teachers respond in a calm and nonviolent manner, in response to student behavior that would have resulted

in a restraint at GHS. During AUSTIN'S entire time at Placer Learning Center he was never restrained.

249. Defendant Betty Jo Wessinger ("WESSINGER") was the Director of Special Education at RUSD from approximately 2011 to 2013. Janna Cambra ("CAMBRA") was the Director of Special Education at RUSD from approximately 2013 to 2015. As Directors of Special Education, WESSINGER and CAMBRA were responsible for the operation of RUSD special education programs to ensure that all eligible children with disabilities in RUSD received appropriate services, and that the District's education programs and services provided to children with disabilities were equivalent to those provided to students without disabilities. WESSINGER and CAMBRA were also responsible for coordinating special education services and programs within RUSD and implementing the SELPA local plan, which includes assurances that: District programs will not discriminate in provision of programs and services to children with disabilities; District programs will comply with state and federal laws, including the ADA, Section 504, the IDEA and the California Education Code, including provisions restricting the use of physical behavior interventions; and personnel providing special education services to District students will meet federal requirements and have the knowledge and skills necessary to serve children with disabilities. Moreover, WESSINGER and CAMBRA were ultimately responsible for evaluating nonpublic school placements of RUSD students on at least an annual basis and ensuring that the NPS provides the services specified in the students' IEP and remains an appropriate placement for the student. WESSINGER and CAMBRA negligently and/or recklessly and/or intentionally disregarded and violated all of the foregoing responsibilities and duties, causing AUSTIN and the other Plaintiffs to suffer irreparable harm and damage.

250. When GHS sent BERs for restraints placed on AUSTIN, they were sent to the attention of WESSINGER and later to CAMBRA.

251. From approximately 2011 to 2013, WESSINGER was an employee and/or agent of RUSD and acting within the scope of her employment and/or agency. From approximately 2013 to 2015, CAMBRA was an employee and/or agent of RUSD and acting within the scope of her employment and/or agency. WESSINGER and CAMBRA failed to carry out their responsibilities and did not monitor or evaluate GHS or its staff. Nor did they insure that AUSTIN or other students within the District placed at GHS were in a safe and appropriate placement in which they were not subjected to disability discrimination, illegal restraints or other physical and emotional abuse.

252. The Program Specialists assigned to AUSTIN's care (Defendant SMAY (2012), Defendant SALVO (2013), Defendant ROYER (2013) and Defendant KAISER (2014) failed in all respects to protect AUSTIN from the subject abuse and assault and tacitly condoned it by their silence and failure to act, all acting under color of state law. Other GHS teachers (SMITH-WILLIAMS and MURRAY) and staff (SCHRICK, ALLEN, RYAN, GOMEZ, ROBINSON, WALLER, CARA JONES, FEAR, SPEISS. HANDER and COSTIN) were active and/or complicit in the perpetration of the abuse upon AUSTIN, either by their participation, tacit or otherwise, or by their failure to act to prevent, stop or report the abuse.

253. The restraints caused physical injuries to AUSTIN, including facial abrasions, bruises to his jaw and neck pain. Defendants also caused AUSTIN severe emotional distress and other physical and psychological injuries. AUSTIN has symptoms of post-traumatic stress disorder with which he struggles on a daily basis. After GHS, AUSTIN became very angry about everything. Austin has been seeing a psychologist since he left Guiding Hands and takes medication for mood disorders.

254. At all times relevant to the complaint, the employees of RUSD and GHS were agents and/or employees of their respective employers acting within the scope of their employment/agency.

255. AUSTIN was born on November 18, 1998, and was a minor while at GHS. Although AUSTIN turned eighteen on November 18, 2016, due to his mental health disabilities, AUSTIN remains legally incompetent. AUSTIN cannot understand legal processes or the court system in such a way as to protect his interests. He cannot make day-to-day decisions to protect his welfare and cannot live independently. AUSTIN has cognitive impairments related to his autism that interfere with his ability to understand cause and effect or anticipate the results of his actions, thus impairing his ability to appreciate his responsibilities as a plaintiff in a lawsuit. For this reason, Timothy Petersen, AUSTIN's father, is AUSTIN's court-appointed guardian ad litem for the purpose of prosecuting this case.

## FIRST CLAIM FOR RELIEF

**(Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq*.)**

M.S. against the CDE

256. Plaintiffs incorporate by reference all preceding paragraphs.

257. Title II of the ADA prohibits public entities from denying persons with disabilities the benefits of its programs, services or activities. 28 U.S.C. § 12132.

258. Defendants are public entities.

259. Plaintiff Students were at all relevant times students with disabilities who had been placed at GHS via their IEPs.

260. The ADA is violated not only by outright discrimination but also when a public entity engages in "forms of discrimination which deny disabled persons public services disproportionately due to their disability." *Crowder v. Kitagawa*, 81 F. 3d 1480, 1483 (9th Cir. 1996); *see also*, *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008). The ADA prohibits governmental agencies from denying persons with disabilities from "the benefits" of their programs. *Mark H.*, 513 F.3d at 937. The ADA requires more than just some access to governmental services; it requires "meaningful access". *Id.*

261. A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability:

- Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
- Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;
- Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;
- Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1)(ii)(iii)(v) and (vii).

262. A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration—

- That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

- That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or
- That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

28 C.F.R. § 35.130(b)(3).

263. A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(6).

264. A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7).

265. A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d).

266. LEAs discriminated against the Plaintiff Students through their contractual arrangements with GHS to provide education services to LEA students with disabilities. Through GHS:

- The LEAs provided the Plaintiff Students with educational aid, benefits and services that were not equal to those provided to students without disabilities;
- The LEAs provided the Plaintiff Students with educational aid, benefits and services that did not afford equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to LEA students without disabilities;
- The LEAs aided and perpetuated disability discrimination against the Plaintiff Students by providing significant state and federal financial assistance to GHS, which discriminated against LEA students on the basis of their disabilities by subjecting them to repeated physical and emotional abuse in response to predictable, disability-related behavior which did not constitute a clear and present danger to the safety of the students or others and which could have

been addressed by less restrictive measures, including those outlined in the students' behavioral intervention plans;

- The LEAs limited the Plaintiff Students from enjoying their right to a free public education in a safe placement, free from discrimination or abuse; and
- The LEAs used administrative methods—specifically the policies and practices of GHS regarding behavioral interventions—that subjected Plaintiff Students to disability discrimination and defeated or substantially impaired the objective of providing a free public education to the Plaintiff Students.

267. Moreover, the LEAs directly discriminated against the Plaintiff Students by administering their public education program and local plans in a manner that resulted in placing and keeping students with disabilities in an unsafe, abusive educational placement. The LEAs did not sufficiently—if at all—investigate, monitor, or supervise the placement. Nor did it acknowledge or direct GHS to correct its known violations of state and federal law against the Plaintiff Students. As a result, the Plaintiff Students were not afforded education services equal to those afforded to other students and were subject to disability discrimination and repeated physical and emotional abuse.

268. The LEAs failed to make reasonable modifications to their program of providing special education services to children within the LEA, such that LEA students with disabilities would not be subject to discrimination and abuse in their educational placements. These modifications—meaningful investigations and evaluations of the NPS prior to placing an LEA student there and forceful oversight, investigation, and measures to ensure compliance with state and federal laws during the placement, including site visits and regular review of school and student records and BERs—would not have constituted a fundamental alteration in the LEAs' programs of providing educational services to their students.

269. GHS's use of restraints was so excessive in frequency, duration, force and purpose that any educator or monitoring official who personally observed the program for more than an hour would realize that the school and its staff had exceeded the legal bounds for emergency interventions and were physically abusing their students. However, the CDE and the LEAs ignored their legal duties to supervise and monitor the program and continued to re-certify GHS and place and leave vulnerable students in the school's care.

270. The LEAs were deliberately indifferent to disability discrimination and abuse of which they knew or should have known had they taken seriously their duties to investigate and

evaluate GHS prior to placing LEA students there; to supervise, monitor, investigate, and ensure the legal compliance of GHS during the placement; and to remove LEA students when it became clear that GHS was not a safe placement and was subjecting the students to physical and emotional abuse and discriminating against them on the basis of their disabilities.

271. CDE abdicated their responsibilities to monitor and supervise restraint use in nonpublic schools and to ensure compliance with state and federal laws prohibiting discrimination and illegal restraint use. The CDE wrongfully justified and continued to wrongfully justify their failure to perform their statutory and regulatory duties to monitor, supervise, train and ensure compliance with laws prohibiting discrimination and child abuse by claiming that such responsibilities fell not upon them, but upon other public agencies or solely upon the nonpublic schools. This shifting of accountability has created an environment wherein the CDE is unwilling to acknowledge its responsibility to ensure that students with disabilities are educated in a safe and non-discriminatory environment, free of physical and emotional abuse. Thus, the CDE continued to certify GHS, and absolve the LEAs of the responsibility to educate and ensure the safety of students with disabilities by handing them off to GHS and never looking back.

272. Defendant CDE knew or should have known that: students with disabilities at nonpublic schools—including GHS—were being restrained frequently, for excessive periods of time, with excessive force, and in response to predictable, disability-related behavior that did not constitute a clear and present danger to the students' or others' safety; the types of restraints being used against children with disabilities were dangerous and have resulted in serious injury to and death of students with disabilities in response to behavior that was known to be a manifestation of the students' disabilities; that the particular disabilities of the children against whom these restraints were used made the restraints even more dangerous; and that the restraints were not only ineffective and contrary to the students' BIPs, but more often than not aggravated the students' behavioral problems.

273. Defendant CDE discriminated against Plaintiffs on the basis of their disabilities by:

- Abdicating its duties to supervise, monitor, investigate, train, and ensure legal compliance of nonpublic schools, including GHS, with laws designed to protect students with disabilities from discrimination and abuse;
- Failing to take even minimal measures to ensure statewide compliance with state and federal laws within nonpublic schools, including GHS;

- Administering its licensing program of certifying, monitoring, investigating and taking corrective action against nonpublic schools which provide educational services to children with disabilities in a discriminatory, cursory, and indifferent manner;
- Failing to make reasonable modifications to its policies and practices regarding certification, monitoring, supervision, investigation, and legal compliance of nonpublic schools in light of repeated notifications from the U.S. Department of Education and other sources regarding the disproportionate use of restraints on children with disabilities and their tragic outcomes; and
- Completely abandoning its duty to monitor and supervise the use of emergency behavioral interventions in nonpublic schools under Cal. Ed. Code § 56521(b).

274. The CDE knew and was deliberately indifferent to the fact that children with disabilities were being restrained at far greater rates than children without disabilities and that the rates of restraint use were significantly higher at "nonpublic" schools such as GHS than at public schools. It took no action to strengthen its oversight and monitoring of nonpublic schools or laws restricting the use of physical interventions. The CDE knew and was deliberately indifferent to allegations that children with disabilities being improperly restrained at GHS and failed to conduct an emergency site visit when they had a substantial reason to believe that there was an immediate danger to the health, safety and welfare of students at GHS. The CDE did not conduct a real investigation or visit the school until after GHS staff killed a student by restraining him.

275. Defendants' actions and failures to act were a substantial factor in causing physical and emotional injuries to the Plaintiff Students as outlined above.

276. Plaintiffs seek compensatory damages, punitive damages and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

**(Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794)**

M.S. against the CDE

277. Plaintiffs incorporate by reference all preceding paragraphs.

278. Section 504 prohibits entities that receive federal financial assistance from denying persons with disabilities the benefits of their programs, services or activities or otherwise discriminate against them on the basis of their disabilities. 29 U.S.C. § 794; 34 C.F.R. pt. 104.

279. Plaintiff Students were at all relevant times students with disabilities who had been placed at GHS by the LEAs in which they resided via their IEPs.

280. The CDE and the LEAs receive federal financial assistance to provide special education services to children with disabilities in California. 20 U.S.C. §§ 1411-1413.

281. Defendant GHS was a "nonpublic school" that contracted with the LEAs to provide educational services to students with disabilities, including the Plaintiff Students, on behalf of the LEAs in exchange for the state and federal financial assistance provided to the LEAs to perform those services. Cal. Ed. Code § 56365. Section 504 therefore applies to GHS. 34 C.F.R. § 104.2 ("This part applies to each recipient of Federal financial assistance from the Department of Education and to the program or activity that receives such assistance.").

282. Section 504 prohibits recipients of federal financial assistance from directly or through contractual, licensing, or other arrangements, on the basis of disability:

- Denying a qualified person with a disability the opportunity to participate in or benefit from the aid, benefit or service;
- Affording a qualified person with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
- Providing a qualified person with a disability with an aid, benefit, or service that is not as effective as that provided to others;
- Aiding or perpetuating discrimination against a qualified person with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to the beneficiaries of the recipients' program or activity;
- Otherwise limiting a qualified person with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

C.F.R. 104.4(b)(1)(i)(ii)(iii)(v) and (vii).

283. Section 504 prohibits recipients of federal financial assistance from directly or through contractual or other arrangements, utilizing criteria or methods of administration:

- that have the effect of subjecting persons with disabilities to discrimination on the basis of their disabilities;

- that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to persons with disabilities; or
- that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

C.F.R. § 104.4(b)(4).

284. GHS engaged in deliberate discrimination against the Plaintiff Students on the basis of their disabilities. GHS and its staff subjected the Plaintiff Students to illegal, excessive and harmful restraints in response to known, disability-related behaviors that did not constitute a clear and present danger to the safety of the students or others and that could have been addressed by less restrictive measures, including those outlined in the students' BIPs. GHS discriminated against the Plaintiff Students by:

- Denying them the opportunity to participate in educational services free from physical and emotional abuse;
- Providing them educational services that were not equal to or as effective as those afforded to children without disabilities;
- Preventing students with disabilities from enjoying their rights to receive a free, public education and the benefits that come with it in an environment free from physical and emotional abuse; and
- administration methods, particularly those regarding behavioral interventions—that subjected students to disability discrimination and that defeated and/or substantially impaired the accomplishment of the students' educational objectives.

285. The LEAs discriminated against the Plaintiff Students through their contractual arrangements with GHS to provide education services to LEA students with disabilities by:

a. Denying them the opportunity to participate in educational services free from physical and emotional abuse;

b. Providing them educational services that were not equal to or as effective as those afforded to children without disabilities;

c. Preventing students with disabilities from enjoying their rights to receive a free, public education and the benefits that come with it in an environment free from physical and emotional abuse; and

d. Using administration methods, particularly those regarding behavioral interventions—that subjected students to disability discrimination and that defeated and/or substantially impaired the accomplishment of the students' educational objectives.

286. The LEAs aided and perpetuated disability discrimination against the Plaintiff Students by providing significant state and federal financial assistance to GHS, which discriminated against LEA students on the basis of their disabilities by subjecting them to repeated physical and emotional abuse in response to predictable, disability-related behavior which did not constitute a clear and present danger to the safety of the students or others and which could have been addressed by less restrictive measures, including those outlined in the students' behavioral intervention plans.

287. Moreover, the LEAs directly discriminated against the Plaintiff Students by administering their public education program and local plans in a manner that resulted in placing and keeping students with disabilities in an unsafe, abusive educational placement. The LEAs did not sufficiently—if at all—investigate, monitor, or supervise the placement. Nor did they acknowledge or direct GHS to correct its known violations of state and federal law against the Plaintiff Students. As a result, the Plaintiff Students were not afforded education services equal to those afforded to other students and were subject to disability discrimination and repeated physical and emotional abuse.

288. CDE abdicated their responsibilities to monitor and supervise restraint use in nonpublic schools and to ensure compliance with state and federal laws prohibiting discrimination and illegal restraint use. The CDE wrongfully justified and continued to wrongfully justify their failure to perform their statutory and regulatory duties to monitor, supervise, train and ensure compliance with laws prohibiting discrimination and child abuse by claiming that such responsibilities fell not upon them, but upon other public agencies or solely upon the nonpublic schools. This shifting of accountability has created an environment wherein the CDE is unwilling to acknowledge its responsibility to ensure that students with disabilities are educated in a safe and non-discriminatory environment, free of physical and emotional abuse. Thus, the CDE continued to certify GHS, and absolve the LEAs of the responsibility to educate and ensure the safety of students with disabilities by handing them off to GHS and never looking back.

289. GHS's use of restraints was so excessive in frequency, duration, force and purpose that any educator or monitoring official who personally observed the program for more than an hour would realize that the school and its staff had exceeded the legal bounds for emergency

interventions and were physically abusing their students. However, the CDE and the LEAs ignored their legal duties to supervise and monitor the program and continued to re-certify GHS and place and leave vulnerable students in the school's care.

290. The LEAs were deliberately indifferent to disability discrimination and abuse of which they knew or should have known had they taken seriously their duties to investigate and evaluate GHS prior to placing LEA students there; to supervise, monitor, investigate, and ensure the legal compliance of GHS during the placement; and to remove LEA students when it became clear that GHS was not a safe placement and was subjecting the students to physical and emotional abuse and discriminating against them on the basis of their disabilities.

291. Defendant CDE knew or should have known that: students with disabilities at nonpublic schools—including GHS—were being restrained frequently, for excessive periods of time, with excessive force, and in response to predictable, disability-related behavior that did not constitute a clear and present danger to the students' or others' safety; the types of restraints being used against children with disabilities were dangerous and have resulted in serious injury to and death of students with disabilities in response to behavior that was known to be a manifestation of the students' disabilities; that the particular disabilities of the children against whom these restraints were used made the restraints even more dangerous; and that the restraints were not only ineffective and contrary to the students' BIPs, but more often than not aggravated the students' behavioral problems.

292. Defendant CDE discriminated against Plaintiffs on the basis of their disabilities by:

- Abdicating its monitoring, investigation and compliance duties with regard to nonpublic schools, including GHS;
- Failing to take even minimal measures to ensure statewide compliance with state and federal laws within nonpublic schools, including GHS;
- Administering its licensing program of certifying, monitoring, investigating and taking corrective action against nonpublic schools which provide educational services to children with disabilities in a discriminatory, cursory, and indifferent manner;
- Failing to make reasonable modifications to its policies and practices regarding certification, monitoring, supervision, investigation, and compliance of nonpublic schools in light of repeated notifications from the U.S. Department of

Education regarding the disproportionate use of restraints on children with disabilities and their tragic outcomes; and

- Completely abandoning its duty to monitor and supervise the use of emergency behavioral interventions in nonpublic schools under Cal. Ed. Code § 56521(b).

293. The CDE knew and was deliberately indifferent to the fact that children with disabilities were being restrained at far greater rates than children without disabilities and that the rates of restraint use were significantly higher at "nonpublic" schools such as GHS than at public schools. It took no action to strengthen its oversight and monitoring of nonpublic schools or laws restricting the use of physical interventions. The CDE knew and was deliberately indifferent to allegations that children with disabilities were being improperly restrained at GHS and failed to conduct an emergency site visit when they had a substantial reason to believe that there was an immediate danger to the health, safety and welfare of students at GHS. The CDE did not conduct a real investigation or visit the school until after GHS staff killed a student by restraining him.

294. Defendants' actions and failures to act were a substantial factor in causing physical and emotional injuries to the Plaintiff Students as outlined above.

295. Plaintiffs seek compensatory damages and attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**

**(42 U.S.C. § 1983, Fourth Amendment to the U.S. Constitution)**

M.S. against TORLAKSON, MEYERS, KELLER and WOHLWEND.

ERIC against TORLAKSON and MEYERS.

DOMINIC against TORLAKSON, MEYERS and KELLER.

SEBASTIAN against TORLAKSON, MEYERS, KELLER and WOHLWEND.

JAMES against TORLAKSON, MEYERS, KELLER and WOHLWEND.

HAYDEN against MEYERS and KELLER.

AUSTIN against TORLAKSON, MEYERS and KELLER.

ALL PLAINTIFFS against YET-TO-BE-IDENTIFIED DEFENDANTS.

296. Plaintiffs incorporate by reference all preceding paragraphs.

***CDE and GHS Defendants***

297. 42 U.S.C. § 1983 provides a legal avenue to sue government officials for violating constitutional rights.

298. The Fourth Amendment protects against unreasonable searches and seizures, including excessive force.

299. Individuals can sue under § 1983 if they believe their Fourth Amendment rights have been violated by state actors.

300. Defendants TORLAKSON, MEYERS, KELLER, WOHLWEND and YET-TO-BE-IDENTIFIED DEFENDANTS used, or failed to prevent the use of, excessive force against Plaintiff M.S. when they restrained him (or permitted his restraint) in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures, including those outlined in his BIP. Defendants' use of (or allowance of the use of) force was objectively unreasonable in light of M.S.'s behavior and California law restricting the use of physical interventions. Defendants' use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

301. Defendants TORLAKSON, MEYERS, KELLER and YET-TO-BE-IDENTIFIED DEFENDANTS used, sanctioned or failed to prevent the use of excessive force against DOMINIC when one or more of them restrained him (or permitted his restraint) in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of DOMINIC or others and that could have been addressed by less restrictive measures, including those outlined in his BIP. Defendants' use of (or allowance of the use of) force was objectively unreasonable in light of DOMINIC's behavior and California law restricting the use of physical interventions. Defendants' use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

302. Defendants TORLAKSON, MEYERS, KELLER, WOHLWEND and YET-TO-BE-IDENTIFIED DEFENDANTS and YET-TO-BE-IDENTIFIED DEFENDANTS used, sanctioned or failed to prevent the use of excessive force against SEBASTIAN when they restrained him (or permitted his restraint) in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of SEBASTIAN or others and that could have been addressed by less restrictive measures, including those outlined in his BIP. Defendants' use of (or allowance of the use of) force was objectively unreasonable in light of SEBASTIAN's behavior and California law restricting the use of physical interventions. Defendants' use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

303. Defendants TORLAKSON, MEYERS, KELLER, WOHLWEND and YET-TO-BE-IDENTIFIED DEFENDANTS and YET-TO-BE-IDENTIFIED DEFENDANTS used,

sanctioned or failed to prevent the use of excessive force against JAMES when they restrained him (or permitted his restraint) in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of JAMES or others and that could have been addressed by less restrictive measures, including those outlined in his BIP. Defendants' use of force was objectively unreasonable in light of JAMES's behavior and California law restricting the use of physical interventions. Defendants' use of (or allowance of the use of) restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

304. Defendants TORLAKSON, MEYERS, KELLER and YET-TO-BE-IDENTIFIED DEFENDANTS staff used, sanctioned or failed to prevent the use of excessive force against HAYDEN when they restrained him (or permitted his restraint) in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of HAYDEN or others and that could have been addressed by less restrictive measures, including those outlined in his BIP. Their use of (or allowance of the use of) force was objectively unreasonable in light of HAYDEN's behavior and California law restricting the use of physical interventions. The use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

305. Defendants TORLAKSON, MEYERS, KELLER, WOHLWEND and YET-TO-BE-IDENTIFIED DEFENDANTS used, sanctioned or failed to prevent the use of excessive force against AUSTIN when they restrained him (or permitted his restraint) in response to predictable, disability-related behavior that did not constitute a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures, including those outlined in his BIP. Their use of (or allowance of the use of) force was objectively unreasonable in light of AUSTIN'S behavior and California law restricting the use of physical interventions. The use of restraints was also unreasonable in their frequency, duration, pressure and restrictions applied, and pain and injuries caused.

306. Defendants TORLAKSON, MEYERS, KELLER, WOHLWEND and YET-TO-BE-IDENTIFIED DEFENDANTS violated the Plaintiff Students' Fourth Amendment rights when they instituted and maintained an illegal policy and practice at GHS of restraining students in response to predictable, disability-related behavior that did not constitute a clear and present threat to the students' or others' safety and that could have been addressed by less restrictive interventions,

such as those outlined in students' BIPs. Such misconduct proximately caused all named Plaintiffs to suffer consequential harm, as is described herein.

307. Defendants TORLAKSON, MEYERS, KELLER, WOHLWEND and YET-TO-BE-IDENTIFIED DEFENDANTS, were acting under color of state law when they instituted, practiced and/or failed to correct an illegal policy of physically restraining students, including the Plaintiff Students, in response to predictable, disability-related behavior that did not constitute a clear and present threat to the students' or others' safety and that could have been addressed by less restrictive interventions, such as those outlined in the students' BIPs.

308. Defendants TORLAKSON, MEYERS, KELLER, WOHLWEND and YET-TO-BE-IDENTIFIED DEFENDANTS, were, at all times herein, acting under color of federal and California state law while they were performing a public function that the LEAs were legally required to provide and for which they were receiving state and federal funds—that of providing free educational services, including special education, to the Plaintiff Students. If an LEA does not have an appropriate special education placement within its district, it may place a student in a nonpublic school. Cal. Ed. Code § 56365. In turn, the student "will be deemed to be enrolled in public schools" for the purpose of state and federal funding. Cal. Ed. Code § 56365(b). However, the LEAs are to monitor and supervise the placement and transition the student back to the public schools if the NPS is no longer appropriate to meet the student's needs. Cal. Ed. Code § 56366(a)(2)(B). The LEA continues to be responsible for the child's placement and special education needs and must participate in their IEP meetings. 20 U.S.C. § 1414(d)(1)(B)(iv).

309. The Plaintiff Students were placed and kept at GHS by the LEAs pursuant to their IEPs. GHS had a Master Contract with each of the Defendant LEAs to provide education services to the Plaintiff Students.

310. GHS sent BERs to the LEAs demonstrating the excessive and illegal nature of the restraints, but this information was filed away and ignored. The IEP teams, in which the LEAs participated, did not review and modify students' BIPs when it was clear they were ineffective or not being followed. Despite knowing that their students were being illegally restrained by GHS staff, the LEAs left the Plaintiff Students at the school and did not take any action to stop the restraints. Because they were unable and unwilling to provide the educational services themselves, the LEAs ignored and thereby allowed the violations of Plaintiffs' constitutional rights, knowingly accepting the benefits of GHS's illegal behavior.

311. At all times relevant to the complaint, the above-named individual Defendant were acting under color of state law in the performance of their official duties to provide educational services, including special education services, to the Plaintiff Students pursuant to state and federal law and GHS's contract with the LEAs.

312. CDE under TORLAKSON's administration abdicated their responsibilities to monitor and supervise restraint use in nonpublic schools and to ensure compliance with state and federal laws prohibiting discrimination and illegal restraint use. The CDE wrongfully justified and continued to wrongfully justify their failure to perform their statutory and regulatory duties to monitor, supervise, train and ensure compliance with laws prohibiting discrimination and child abuse by claiming that such responsibilities fell not upon them, but upon other public agencies or solely upon the nonpublic schools. This shifting of accountability has created an environment wherein the CDE is unwilling to acknowledge its responsibility to ensure that students with disabilities are educated in a safe and non-discriminatory environment, free of physical and emotional abuse. Thus, the CDE continued to certify GHS, and absolve the LEAs of the responsibility to educate and ensure the safety of students with disabilities by handing them off to GHS and never looking back.

313. Defendants TORLAKSON, MEYERS, KELLER, WOHLWEND and YET-TO-BE-IDENTIFIED DEFENDANTS knowingly deprived the Plaintiff Students of their Fourth Amendment rights to be free from excessive force.

314. Defendants' actions and failures to act were a substantial factor in causing physical and emotional injuries to the Plaintiff Students.

315. Plaintiffs seek compensatory damages and attorneys' fees and costs.

## **FOURTH CLAIM FOR RELIEF**

### **Cal. Education Code §§ 220**

M.S., ERIC, DOMINIC, SEBASTIAN, JAMES, HAYDEN, and AUSTIN against GHS

M.S. against the CDE

316. Plaintiffs incorporate by reference all preceding paragraphs.

317. 2024 California Code

Education Code - EDC

TITLE 1 - GENERAL EDUCATION CODE PROVISIONS

DIVISION 1 - GENERAL EDUCATION CODE PROVISIONS

PART 1 - GENERAL PROVISIONS

CHAPTER 2 - Educational Equity

ARTICLE 3 - Prohibition of Discrimination

Section 220.

Universal Citation: CA Educ Code § 220 (2024)

220. No person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid.

318. At all times relevant to the complaint, Defendants GHS and CDE received state financial assistance.

319. GHS was a nonpublic school which was contracted to provide the Plaintiff Students with the educational services.

320. GHS and its staff subjected the Plaintiff Students to severe, pervasive and offensive physical and emotional abuse in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that should have been addressed by less restrictive measures.

321. The CDE knew that nonpublic schools were disproportionately placing students with disabilities in excessive, dangerous and illegal restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures. Yet the CDE maintained a policy and practice of ignoring this behavior, failing to proactively monitor nonpublic schools or their use of behavioral interventions, failing to respond to allegations of abuse and illegal behavioral interventions, and failing to respond to sustained complaints of restrain abuse with measures effective to ensure compliance. Moreover, the CDE ignored its duty to respond to allegations of restraint abuse at GHS and did not conduct a site visit or investigation until after GHS had killed Max Benson and repeatedly abused the Plaintiff Students. The CDE was deliberately indifferent to the disability discrimination and abuse to which the Plaintiff Students were subjected at GHS.

322. Defendants' actions and failures to act deprived the Plaintiff Students of equal access to the benefits and opportunities of receiving a public education in a safe, non-discriminatory, non-abusive placement.

323. Defendants' actions and failures to act were a substantial factor in causing physical and emotional injuries to the Plaintiff Students.

324. Plaintiffs seek compensatory damages and attorneys' fees and costs.

## **<u>FIFTH CLAIM FOR RELIEF</u>**

### **Unruh Civil Rights Act, Cal. Civ. Code § 51**

M.S., ERIC, DOMINIC, SEBASTIAN, JAMES, HAYDEN, and AUSTIN against GHS

325. Plaintiffs incorporate by reference all preceding paragraphs.

326. California Code, Civil Code - CIV § 51

(a) This section shall be known, and may be cited, as the Unruh Civil Rights Act.

(b) All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

(c) This section shall not be construed to confer any right or privilege on a person that is conditioned or limited by law or that is applicable alike to persons of every sex, color, race, religion, ancestry, national origin, disability, medical condition, marital status, sexual orientation, citizenship, primary language, or immigration status, or to persons regardless of their genetic information.

(d) Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law, to any new or existing establishment, facility, building, improvement, or any other structure, nor shall anything in this section be construed to augment, restrict, or alter in any way the authority of the State Architect to require construction, alteration, repair, or modifications that the State Architect otherwise possesses pursuant to other laws.

(e) For purposes of this section:

(1) “Disability” means any mental or physical disability as defined in Sections 12926 and 12926.1 of the Government Code.

(2)(A) “Genetic information” means, with respect to any individual, information about any of the following:

(i) The individual's genetic tests.

(ii) The genetic tests of family members of the individual.

(iii) The manifestation of a disease or disorder in family members of the individual.

(B) “Genetic information” includes any request for, or receipt of, genetic services, or participation in clinical research that includes genetic services, by an individual or any family member of the individual.

(C) “Genetic information” does not include information about the sex or age of any individual.

(3) “Medical condition” has the same meaning as defined in subdivision (i) of Section 12926 of the Government Code.

(4) “Religion” includes all aspects of religious belief, observance, and practice.

(5) “Sex” includes, but is not limited to, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth. “Sex” also includes, but is not limited to, a person's gender. “Gender” means sex, and includes a person's gender identity and gender expression. “Gender expression” means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth.

(6) “Sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, * * * sexual orientation, citizenship, primary language, or immigration status” includes a perception that the person has any particular characteristic or characteristics within the listed categories or that the person is associated with a person who has, or is perceived to have, any particular characteristic or characteristics within the listed categories.

(7) “Sexual orientation” has the same meaning as defined in subdivision (s) of Section 12926 of the Government Code.

(f) A violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) 1 shall also constitute a violation of this section.

(g) Verification of immigration status and any discrimination based upon verified immigration status, where required by federal law, shall not constitute a violation of this section.

(h) Nothing in this section shall be construed to require the provision of services or documents in a language other than English, beyond that which is otherwise required by other provisions of federal, state, or local law, including Section 1632.Defendant GHS discriminated against the Plaintiff Students by subjecting them to physical and emotional abuse in response to disability-related behavior that did not constitute a clear and present danger to the safety of the students or others and that could and should have been addressed by less restrictive measures, including those listed in the individual students' BIPs.

327. Defendant GHS is a business establishment within the meaning of Cal. Civ. Code § 51.

328. GHS's use of restraints was so excessive in frequency, duration, force and purpose that any educator or monitoring official who personally observed the program for more than an hour would realize that the school and its staff had exceeded the legal bounds for emergency interventions and were physically abusing their students.

329. Defendants' behavior constitutes a violation of the Americans with Disabilities Act of 1990. A violation of the ADA is a violation of the Unruh Act, Cal. Civ. Code § 51(f).

330. Defendants' actions and failures to act were a substantial factor in causing physical and emotional injuries to the Plaintiff Students.

331. Plaintiffs therefore seek actual damages, treble damages against GHS, and attorneys' fees and costs pursuant to Cal. Civ. Code § 52(a).

**SIXTH CLAIM FOR RELIEF**

**(Ralph Act, Cal. Civ. Code § 51.7)**

M.S., ERIC, DOMINIC, SEBASTIAN, JAMES, HAYDEN, and AUSTIN against GHS

332. Plaintiffs incorporate by reference all preceding paragraphs.

333. California Code, Civil Code - CIV § 51.7

(a) This section shall be known, and may be cited, as the Ralph Civil Rights Act of 1976.

(b)(1) All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive.

(2) For purposes of this subdivision, "intimidation by threat of violence" includes, but is not limited to, making or threatening to make a claim or report to a peace officer or law enforcement agency that falsely alleges that another person has engaged in unlawful activity or in an activity that requires law enforcement intervention, knowing that the claim or report is false, or with reckless disregard for the truth or falsity of the claim or report.

(c)(1) A person shall not require another person to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, as a condition of entering into a contract for goods or services, including the right to file and pursue a civil action or complaint with, or otherwise notify, the Attorney General or any other public prosecutor, or law enforcement agency, the Civil Rights Department, or any court or other governmental entity.

(2) A person shall not refuse to enter into a contract with, or refuse to provide goods or services to, another person on the basis that the other person refuses to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, including the right to file and pursue a civil action or complaint with, or otherwise notify, the Attorney General or any other public prosecutor, or law enforcement agency, the Civil Rights Department, or any other governmental entity.

(3) Any waiver of any legal right, penalty, remedy, forum, or procedure for a violation of this section, including the right to file and pursue a civil action or complaint with, or otherwise notify, the Attorney General or any other public prosecutor, or law enforcement agency, the Civil Rights Department, or any

other governmental entity shall be knowing and voluntary, in writing, and expressly not made as a condition of entering into a contract for goods or services or as a condition of providing or receiving goods and services.

(4) Any waiver of any legal right, penalty, remedy, forum, or procedure for a violation of this section that is required as a condition of entering into a contract for goods or services shall be deemed involuntary, unconscionable, against public policy, and unenforceable. This subdivision does not affect the enforceability or validity of any other provision of the contract.

(5) A person who seeks to enforce a waiver of any legal right, penalty, remedy, forum, or procedure for a violation of this section has the burden of proving that the waiver was knowing and voluntary and not made as a condition of the contract or of providing or receiving the goods or services.

(6) The exercise of a person's right to refuse to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, including a rejection of a contract requiring a waiver, does not affect any otherwise legal terms of a contract or an agreement.

(7) This subdivision does not apply to an agreement to waive any legal rights, penalties, remedies, forums, or procedures for a violation of this section after a legal claim has arisen.

(8) This subdivision applies to an agreement to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, including an agreement to accept private arbitration, entered into, altered, modified, renewed, or extended on or after January 1, 2015.

(d) This section does not apply to statements concerning positions in a labor dispute that are made during otherwise lawful labor picketing.

(e) The Legislature finds and declares that this section was enacted as part of the Ralph Civil Rights Act of 1976, in Chapter 1293 of the Statutes of 1976.

(f) This section does not negate or otherwise abrogate the provisions of Sections 1668, 1953, and 3513.

334. The Plaintiff Students are persons with disabilities.

335. Defendant GHS, its administrators and its employees threatened to and did commit physical violence against the Plaintiff Students in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could and should have been addressed by less restrictive measures. These actions constituted violations Cal. Civ. Code § 51.7. GHS's staff and administrators were employees and/or agents of GHS and were acting within the scope of their employment and/or agency at all times relevant to the complaint. GHS is therefore vicariously liable for its staff members' and administrators' violations of Cal. Civ. Code § 51.7.

336. Defendants' actions and omissions caused physical and emotional injuries to the Plaintiff Students.

337. Plaintiffs therefore seek actual damages, exemplary damages against GHS, attorneys' fees and costs, and a civil penalty against GHS of $25,000 per Plaintiff pursuant to Cal. Civ. Code 52(b)(2).

**SEVENTH CLAIM FOR RELIEF**

**(Thomas Bane Civil Rights Act, Cal. Civ. Code § 52.1)**

M.S., ERIC, DOMINIC, SEBASTIAN, JAMES, HAYDEN, and AUSTIN against GHS

338. Plaintiffs incorporate by reference all preceding paragraphs.

339. Defendant GHS, its administrators and its employees interfered with the Plaintiff Students' exercise and enjoyment of their rights to a free, public education by threatening, intimidating and coercing them with physical violence, specifically by subjecting them to unlawful restraints and other abusive physical interventions in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could and should have been addressed by less restrictive measures. Defendants' actions constituted violations Cal. Civ. Code § 52.1. GHS's staff and administrators were employees and/or agents of GHS and were acting within the scope of their employment and/or agency at all times relevant to the complaint. GHS is therefore vicariously liable for its staff members' and administrators' violations of Cal. Civ. Code § 52.1.

340. Defendants' actions and omissions caused physical and emotional injuries to the Plaintiff Students.

341. Plaintiffs seek actual damages, exemplary damages only against GHS, and attorneys' fees and costs.

**EIGHTH CLAIM FOR RELIEF**

**(Battery)**

M.S. against MEYERS, KELLER and WOHLWEND.

ERIC against MEYERS.

DOMINIC against MEYERS and KELLER.

SEBASTIAN against MEYERS, KELLER and WOHLWEND.

JAMES against MEYERS, KELLER and WOHLWEND.

HAYDEN against MEYERS and KELLER.

AUSTIN against MEYERS and KELLER.

ALL PLAINTIFFS against YET-TO-BE-IDENTIFIED DEFENDANTS.

342. Plaintiffs incorporate by reference all preceding paragraphs.

***GHS and GHS Employees***

343. As described more fully above, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff M.S. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

344. M.S. did not consent to such restraints or physical interventions which constituted physical batteries upon M.S.

345. Defendants thereby caused M.S. to suffer physical and emotional injuries. As described more fully above, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff DOMINIC in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of DOMINIC or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

346. DOMINIC did not consent to such restraints or physical interventions.

347. Defendants caused DOMINIC physical and emotional injuries.

348. As described more fully above, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff SEBASTIAN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of SEBASTIAN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

349. SEBASTIAN did not consent to such restraints or physical interventions.

350. Defendants caused SEBASTIAN physical and emotional injuries.

351. As described more fully above, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff JAMES in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of JAMES or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

352. JAMES did not consent to such restraints or physical interventions.

353. Defendants caused JAMES physical and emotional injuries.

354. As described more fully above, GHS staff intentionally restrained ERIC in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of ERIC or others and that could have been addressed by less restrictive measures. This restraint was not legally justified.

355. ERIC did not consent to the restraint.

356. Defendants caused ERIC physical and emotional injuries.

357. As described more fully above, GHS staff intentionally restrained or otherwise performed physical interventions on HAYDEN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of HAYDEN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

358. HAYDEN did not consent to such restraints or physical interventions.

359. Defendants caused HAYDEN physical and emotional injuries.

360. As described more fully above, Defendants intentionally restrained or otherwise performed physical interventions on AUSTIN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

361. AUSTIN did not consent to such restraints or physical interventions.

362. Defendants caused AUSTIN physical and emotional injuries.

363. As GHS administrators, Defendants had the responsibility and power to develop, implement and enforce policies and procedures regarding the use of physical interventions and restraints at GHS. Defendants created, implemented and maintained a policy and practice at GHS of subjecting students to restraints in response to predictable, disability-related behavior that did

not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures. Defendants knew and were deliberately indifferent to the fact that GHS staff were subjecting students to illegal restraints and other unreasonable physical interventions. Plaintiffs allege on information and believe that in some cases Defendants participated directly in the restraints and physical interventions to which the Plaintiff Students were subjected. Defendants' actions and failures to act caused the Plaintiff Students to be subjected to restraints and other physical interventions to which they did not consent. As a result, the Plaintiff Students suffered physical and emotional injuries death.

364. Plaintiffs seek actual damages, exemplary damages against the above-referenced Defendants, and attorneys' fees and costs.

**NINTH CLAIM FOR RELIEF**

**(Assault)**

PLAINTIFF STUDENTS against GHS, MEYERS, and KELLER

M.S. against WOHLWEND,

SEBASTIAN against WOHLWEND

JAMES against WOHLWEND

PLAINTIFFS STUDENTS against GHS and OTHER YET-TO-BE-IDENTIFIED DEFENDANTS

365. Plaintiffs incorporate by reference all preceding paragraphs.

***GHS and GHS Employees***

366. Pursuant to the doctrine of *respondeat superior*, an employer is liable for the actions of their employees when those actions occur within the scope of their employment as a matter of vicarious liability, meaning one person is held responsible for the actions of another, indicating that employer can be sued for damages caused by their employee, even if the employer wasn't directly involved. At all times relevant herein, employees and staff of GHS were acting individually and on behalf of GHS. Therefore employees and staff of GHS were and are also GHS's alter ego, and thereby, individually and/or in concert with the other Defendants, controlled GHS, and are accordingly individually liable for any conduct otherwise attributed herein to employees and staff of GHS, and thereby causing GHS (including any other yet-to-be-identified individual Defendants) to be liable for all of employees and staff of GHS's and others' (yet-to-be-identified) individual misconduct described herein above.

367. As described more fully above, GHS staff and employees, including but not limited to, Defendants MEYERS, KELLER and WOHLWEND acted individually and on behalf of GHS and other defendants with the intent to cause harmful or offensive contact to M.S. Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff M.S. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

368. M.S. reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

369. Defendants caused M.S. physical and emotional injuries.

370. As described more fully above, GHS staff and employees, including but not limited to, Defendants MEYERS and KELLER acted negligently/reckless and/or with the intent to cause harmful or offensive contact to DOMINIC Specifically, said Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff DOMINIC in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of DOMINIC or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

371. DOMINIC reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

372. Defendants caused DOMINIC physical and emotional injuries.

373. As described more fully above, GHS staff and employees, including but not limited to, Defendants MEYERS, KELLER and WOHLWEND acted negligently/reckless and/or with the intent to cause harmful or offensive contact to SEBASTIAN Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff SEBASTIAN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of SEBASTIAN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

374. SEBASTIAN reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

375. Defendants caused SEBASTIAN physical and emotional injuries.

376. As described more fully above, GHS staff and employees, including but not limited to, Defendants MEYERS, KELLER and WOHLWEND acted negligently/reckless and/or with the

intent to cause harmful or offensive contact to JAMES Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff JAMES in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of JAMES or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

377. JAMES reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

378. Defendants caused JAMES physical and emotional injuries.

379. As described more fully above, GHS staff and employees acted negligently/reckless and/or with the intent to cause harmful or offensive contact to ERIC Specifically, Defendants intentionally restrained ERIC in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of ERIC or others and that could have been addressed by less restrictive measures. This restraint was not legally justified.

380. ERIC reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

381. Defendants caused ERIC physical and emotional injuries.

382. As described more fully above, GHS staff and employees, acted negligently/reckless and/or with the intent to cause harmful or offensive contact to HAYDEN Specifically, Defendants intentionally restrained or otherwise performed physical interventions on HAYDEN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of HAYDEN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

383. HAYDEN reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

384. Defendants caused HAYDEN physical and emotional injuries.

385. As described more fully above, GHS staff and employees, including but not limited to, Defendants MEYERS and KELLER acted negligently/reckless and/or with the intent to cause harmful or offensive contact to AUSTIN. Specifically, these Defendants intentionally restrained or otherwise performed physical interventions on AUSTIN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

386. AUSTIN reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

387. Defendants caused AUSTIN physical and emotional injuries.

388. As State and GHS administrators, Defendants MEYERS and KELLER had the responsibility and power to develop, implement and enforce policies and procedures regarding the use of physical interventions and restraints at GHS. Defendants created, implemented and maintained a policy and practice at GHS of subjecting students to restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures. Defendants knew and were deliberately indifferent to the fact that GHS staff were subjecting students to illegal restraints and other unreasonable physical interventions. Plaintiffs allege on information and believe that in some cases Defendants MEYERS, and KELLER participated directly in the restraints and physical interventions to which the Plaintiff Students were subjected.

389. Defendants' actions and failures to act were a substantial factor in causing the Plaintiff Students to reasonably believe that GHS staff intended to subject them to harmful and offensive contact to which they did not consent. As a result, the Plaintiff Students suffered physical and emotional injuries, and in the case of fellow student MAX BENSON, death.

390. Plaintiffs seek compensatory damages and punitive damages against the above-referenced Defendants.

## TENTH CLAIM FOR RELIEF

**(False Imprisonment)**

PLAINTIFF STUDENTS against GHS, MEYERS, and KELLER

M.S. against WOHLWEND,

SEBASTIAN against WOHLWEND

JAMES against WOHLWEND

PLAINTIFFS STUDENTS against GHS and OTHER YET-TO-BE-IDENTIFIED DEFENDANTS

391. Plaintiffs incorporate by reference all preceding paragraphs.

***GHS and GHS Employees***

392. As described more fully above, GHS staff and employees, including but not limited to, Defendants MEYERS, KELLER and WOHLWEND, individually and action on behalf of GHS, intentionally confined or failed to prevent the confinement of M.S. for an appreciable length of

time. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff M.S. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

393. M.S. did not consent to the confinement.

394. Defendants caused M.S. physical and emotional injuries.

395. As described more fully above, GHS staff and employees, including but not limited to, Defendants MEYERS and KELLER, individually and action on behalf of GHS, intentionally confined or failed to prevent the confinement of DOMINIC for an appreciable length of time. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff DOMINIC in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of DOMINIC or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

396. DOMINIC did not consent to the confinement.

397. Defendants caused DOMINIC physical and emotional injuries.

398. As described more fully above, GHS staff and employees, including but not limited to, Defendants MEYERS, KELLER and WOHLWEND intentionally confined or failed to prevent the confinement of SEBASTIAN for an appreciable length of time. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff SEBASTIAN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of SEBASTIAN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

399. SEBASTIAN did not consent to the confinement.

400. Defendants caused SEBASTIAN physical and emotional injuries.

401. As described more fully above, GHS staff and employees, including but not limited to, Defendants MEYERS, KELLER and WOHLWEND intentionally confined or failed to prevent the confinement of JAMES for an appreciable length of time. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff JAMES in response to predictable, disability-related behavior that did not present a clear

and present danger to the safety of JAMES or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

402. JAMES did not consent to the confinement.

403. Defendants caused JAMES physical and emotional injuries.

404. As described more fully above, GHS staff intentionally confined or failed to prevent the confinement of ERIC for an appreciable length of time. Specifically, Defendants intentionally restrained ERIC in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of ERIC or others and that could have been addressed by less restrictive measures. This restraint was not legally justified.

405. ERIC did not consent to the confinement.

406. Defendants caused ERIC physical and emotional injuries.

407. As described more fully above, GHS staff and employees intentionally confined or failed to prevent the confinement of HAYDEN for an appreciable length of time. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on HAYDEN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of HAYDEN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

408. HAYDEN did not consent to the confinement.

409. Defendants caused HAYDEN physical and emotional injuries.

410. As described more fully above, GHS staff and employees intentionally confined or failed to prevent the confinement of AUSTIN for an appreciable length of time. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on AUSTIN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

411. AUSTIN did not consent to the confinement.

412. Defendants caused AUSTIN physical and emotional injuries.

413. As SSPI, TORLAKSON and GHS administrators, Defendants MEYERS, and KELLER, had the responsibility and power to develop, implement and enforce policies and procedures regarding the use of physical interventions and restraints at GHS. Defendants created, implemented and maintained a policy and practice at GHS of subjecting students to restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat

to the safety of the students or others and that could have been addressed by less restrictive measures. Defendants knew and were deliberately indifferent to the fact that GHS staff were subjecting students to illegal restraints and other unreasonable physical interventions. Plaintiffs allege on information and belief that in some cases Defendants MEYERS, and KELLER participated directly in the restraints and physical interventions to which the Plaintiff Students were subjected. Defendants' actions and failures to act were a substantial factor in causing the Plaintiff Students to be intentionally and illegally confined or failed to prevent the confinement of for an appreciable length of time without their consent. As a result, the Plaintiff Students suffered physical and emotional injuries, and in the case of fellow student MAX BENSON, death.

414. Plaintiffs seek compensatory damages and punitive damages against the above-referenced Defendants.

**ELEVENTH CLAIM FOR RELIEF**

**(Intentional Infliction of Emotional Distress)**

PLAINTIFF STUDENTS against GHS, MEYERS, and KELLER

M.S. against WOHLWEND,

SEBASTIAN against WOHLWEND

JAMES against WOHLWEND

PLAINTIFFS STUDENTS against GHS and OTHER YET-TO-BE-IDENTIFIED DEFENDANTS

415. Plaintiffs incorporate by reference all preceding paragraphs.

***GHS Defendants***

416. As described more fully above, the conduct of GHS staff and employees, including but not limited to, Defendants MEYERS, KELLER and WOHLWEND, extreme and outrageous. This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to M.S.

417. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff M.S. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

418. Defendants' conduct did cause severe and extreme emotional distress to M.S.

419. As described more fully above, the conduct of GHS staff and employees, including but not limited to, Defendants MEYERS and KELLER, was extreme and outrageous. This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to DOMINIC Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff DOMINIC in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of DOMINIC or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

420. Defendants' conduct did cause severe and extreme emotional distress to DOMINIC

421. As described more fully above, the conduct of GHS staff and employees, including but not limited to, Defendants MEYERS, KELLER and WOHLWEND, was extreme and outrageous. This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to SEBASTIAN Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff SEBASTIAN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of SEBASTIAN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

422. Defendants' conduct did cause severe and extreme emotional distress to SEBASTIAN

423. As described more fully above, the conduct of Defendants GHS staff and employees was extreme and outrageous. This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to JAMES Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on Plaintiff JAMES in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of JAMES or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

424. Defendants' conduct did cause severe and extreme emotional distress to JAMES

425. As described more fully above, the conduct of GHS staff was extreme and outrageous. This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to ERIC Specifically, GHS staff intentionally restrained ERIC in response to predictable, disability-related behavior that did not present a clear and present danger

to the safety of ERIC or others and that could have been addressed by less restrictive measures. This restraint was not legally justified.

426. The conduct of GHS staff did cause severe and extreme emotional distress to ERIC

427. As described more fully above, the conduct of GHS staff and employees, was extreme and outrageous. This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to HAYDEN Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on HAYDEN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of HAYDEN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

428. The conduct of GHS staff did cause severe and extreme emotional distress to HAYDEN

429. As described more fully above, the conduct of GHS staff and employees was extreme and outrageous. This conduct was intended to cause distress or with reckless disregard of the probability of causing distress to AUSTIN and did cause severe and extreme emotional distress to AUSTIN. Specifically, Defendants intentionally restrained or otherwise performed excessive and lengthy physical interventions on AUSTIN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

430. The conduct of GHS staff did cause severe and extreme emotional distress to AUSTIN.

431. As the SSPI and GHS administrators, Defendants had the responsibility and power to develop, implement and enforce policies and procedures regarding the use of physical interventions and restraints at GHS. Defendants created, implemented and maintained a policy and practice at GHS of subjecting students to restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures. Defendants knew and were deliberately indifferent to the fact that GHS staff were subjecting students to illegal restraints and other unreasonable physical interventions. Plaintiffs allege on information and believe that in some cases Defendants MEYERS, and KELLER participated directly in the restraints and physical interventions to which the Plaintiff Students were subjected. Defendants' actions and failures to

act were a substantial factor in causing the Plaintiff Students to suffer severe and extreme emotional distress.

432. Plaintiffs seek compensatory damages and punitive damages against the above-referenced Defendants.

## TWELFTH CLAIM FOR RELIEF

**(Negligence)**

PLAINTIFF STUDENTS against GHS, MEYERS, and KELLER

PLAINTIFF M.S. against CDE, SSPI TORLAKSON

M.S. against WOHLWEND,

SEBASTIAN against WOHLWEND

JAMES against WOHLWEND

PLAINTIFFS STUDENTS against GHS and OTHER YET-TO-BE-IDENTIFIED DEFENDANTS

433. Plaintiffs incorporate by reference all preceding paragraphs.

***GHS and GHS Employees***

434. Defendants CDE, SSPI, TORLAKSON and GHS staff and employees owed a duty to M.S. not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse. Defendants breached this duty repeatedly when they placed M.S. in lengthy, harmful, and illegal restraints in response to predictable, disability-related behavior that did not cause a clear and present threat to M.S.'s physical safety or those of others and that could have been addressed by less restrictive measures. Defendants' breach of their duties to M.S. caused him foreseeable physical and emotional injuries.

435. Defendants GHS staff and employees owed a duty to DOMINIC not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse. Defendants breached this duty repeatedly when they placed DOMINIC in lengthy, harmful, and illegal restraints in response to predictable, disability-related behavior that did not cause a clear and present threat to DOMINIC's physical safety or those of others and that could have been addressed by less restrictive measures. Defendants' breach of their duties to DOMINIC caused him foreseeable physical and emotional injuries.

436. Defendants and GHS staff and employees owed a duty to SEBASTIAN not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse. Defendants breached this duty repeatedly when they placed SEBASTIAN in lengthy, harmful, and

illegal restraints in response to predictable, disability-related behavior that did not cause a clear and present threat to SEBASTIAN's physical safety or those of others and that could have been addressed by less restrictive measures. Defendants' breach of their duties to SEBASTIAN caused him foreseeable physical and emotional injuries.

437. Defendants GHS staff and employees owed a duty to JAMES not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse. Defendants breached this duty repeatedly when they placed JAMES in lengthy, harmful, and illegal restraints in response to predictable, disability-related behavior that did not cause a clear and present threat to JAMES's physical safety or those of others and that could have been addressed by less restrictive measures. Defendants' breach of their duties to JAMES's caused him foreseeable physical and emotional injuries.

438. Defendants GHS staff members owed a duty to ERIC not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse. These staff members breached their duty when they placed ERIC in a lengthy, harmful, and illegal restraint in response to predictable, disability-related behavior that did not cause a clear and present threat to ERIC's physical safety or those of others and that could have been addressed by less restrictive measures. This breach of duties to ERIC caused him foreseeable physical and emotional injuries.

439. Defendants GHS staff members owed a duty to HAYDEN not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse. These staff members breached their duty repeatedly when they placed HAYDEN in lengthy, harmful, and illegal restraints in response to predictable, disability-related behavior that did not cause a clear and present threat to HAYDEN's physical safety or those of others and that could have been addressed by less restrictive measures. This breach of duties to HAYDEN caused him foreseeable physical and emotional injuries.

440. Defendants GHS staff members owed a duty to AUSTIN not to place him in illegal and harmful restraints or subject him to other legally unjustified physical abuse. These staff members breached their duty repeatedly when they placed AUSTIN in lengthy, harmful, and illegal restraints in response to predictable, disability-related behavior that did not cause a clear and present threat to AUSTIN's physical safety or those of others and that could have been addressed by less restrictive measures. This breach of duties to AUSTIN caused him foreseeable physical and emotional injuries.

441. At all times relevant to this complaint, CDE employees, SSPI employees, TORLAKSON and GHS staff were acting within the scope of their employment and/or agency. CDE, GHS, SSPI and TORLAKSON are therefore vicariously liable for their acts and failures to act as described above.

442. Schools owe a special duty to their students arising from the comprehensive control over students exercised by the staff of the school in which a student is placed. *Hoff v. Vacaville Unified School Dist*., 19 Cal.4th 925, 935 (1998); *Virginia G. v. ABC Unified School Dist.*, 15 Cal.App.4th 1848, 1851–1855 (1993). This includes a duty to ensure that students are not subjected to discrimination or abuse. School administrators have a duty to take "reasonable measures to guard pupils against harassment and abuse from foreseeable sources, including any teachers and counselors they know or have reason to know are prone to such abuse."

443. As administrators of GHS, Defendants CHRISTENSON, NARAN, MEYERS, and KELLER breached this duty to the Plaintiff students. CHRISTENSON, NARAN, MEYERS, and KELLER knew that GHS staff were subjecting its students, including the Plaintiff Students, to illegal restraints and other unlawful physical interventions and failed to take actions to prevent such abuse, such as the development and effective implementation of policies and practices governing emergency interventions, staff training, supervision, and retention. To the contrary, Defendants implemented and encouraged a policy and practice at GHS of responding to students' predictable, disability-related behavior with lengthy, harmful, and illegal restraints, even when the students' behavior did not cause a clear and present threat to the physical safety of the students or others and could have been addressed by less restrictive measures. The breach of these duties caused foreseeable physical and emotional injuries to the Plaintiff Students. In the case of MAX BENSON, Defendants' breach was a substantial factor in causing MAX BENSON's death.

444. At all times relevant to the complaint, GHS's staff and administrators were employees and/or agents of GHS and were acting within the scope of their employment and/or agency. GHS is therefore vicariously liable for their actions and failures to act.

***CDE***

445. Defendant CDE (including SSPI and Defendant TORLAKSON) owed mandatory statutory and regulatory duties to the Plaintiff Student M.S., including but not limited to:

- Monitoring and supervision of the implementation of laws restricting the use of physical interventions on children with disabilities, including those placed in nonpublic schools. Cal. Ed. Code § 56520, *et. seq.*; Cal. Ed. Code § 56521(a) and (b);

- Monitoring "the implementation of local plans by periodically conducting onsite program and fiscal reviews," including at nonpublic schools. Cal. Ed. Code § 56125(b);
- Assuring "provision of, and supervising, education and related services to individuals with exceptional needs as specifically required pursuant to the Individuals with Disabilities Education Act." Cal. Ed. Code § 56135(a);
- Providing onsite program reviews of the implementation of special education plans. Cal. Ed. Code § 56606;
- Monitoring pupil and program performance results and provide monitoring and technical assistance to assure compliance with the IDEA. Cal. Ed. Code § 56600.6;
- Post-certification onsite reviews of nonpublic schools every three years if there are no formal complaints, but once a year if there has been a formal complaint against the school. Cal. Ed. Code § 56366.1(e)(1);
- Onsite, unannounced investigations of nonpublic schools "if there is substantial reason to believe that there is an immediate danger to the health, safety, or welfare of a child." Cal. Ed. Code § 56366.1(i)(1);
- An investigation of the nonpublic school if the SSPI "receives evidence of a significant deficiency in the quality of educational services provided". Cal. Ed. Code § 56366.1(i)(2); and
- Monitoring of "the facilities, the educational environment, and the quality of the educational program, including the teaching staff" of any certified nonpublic school, which includes onsite reviews every two out of three years. Cal. Ed. Code § 56366.1(j).

446. Those duties were designed to ensure that all children in California, including those with disabilities, receive an education free from discrimination and abuse.

447. From repeated communications from the U.S. Department of Education and non-profit advocates, as well as media reports, lawsuits and compliance complaints, the CDE knew that nonpublic schools were disproportionately placing students with disabilities in excessive, dangerous and illegal restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures. Yet the CDE maintained a policy and practice of ignoring this behavior, failing to proactively monitor nonpublic schools or their use of behavioral interventions, failing to respond to allegations of abuse and illegal behavioral interventions, and failing to respond to sustained complaints of restrain abuse with measures effective to ensure

compliance. Moreover, the CDE ignored its duty to respond to specific allegations of restraint abuse at GHS and did not conduct a site visit or investigation until after GHS had killed MAX BENSON and repeatedly abused the Plaintiff Students.

448. Defendant CDE, SSPI and TORLAKSON negligently and unreasonably breached its legal duties to M.S. It was foreseeable that such a breach of Defendants' duties would cause students such as M.S. to be subjected to discrimination and harmful, unlawful restraints. Defendant's actions and failures to act were a substantial factor in causing foreseeable physical and emotional injuries to M.S.

449. Plaintiffs seek compensatory damages and punitive damages against the above-referenced Defendants (except against the public entities).

**<u>THIRTEENTH CLAIM FOR RELIEF</u>**

**(Fraud)**

STARK, DARROUGH, COUGHLIN, KINSER, DAVIS, CALER and MULLER against GHS, TORLAKSON, CHRISTENSON, NARAN, MEYERS and KELLER

450. Plaintiff Parents incorporate by reference all preceding paragraphs.

451. The above-identified Defendants were under a duty to speak to or to disclose to Plaintiffs all material facts regarding the care and treatment of Plaintiffs' children while such children were in Defendants' care and to disclose all known material facts relating to such care that would impact in any way upon the physical and psychological well-being of such children, to include, but not limited to all measures to be utilized by Defendants to enforce discipline or to otherwise control or regulate the behavior of such children, specifically the utilization and corresponding risks of the restraint system designed by HWC, in addition to other applications of potentially dangerous and harmful physical force.

452. Such duty was born of Defendants' superior knowledge concerning the methods, "educational," "disciplinary" or otherwise, that Defendants had and would condone and/or approve of to be utilized by one or more of the Defendants in order to effectuate discipline and/or control of Plaintiffs' children.

453. Such duty of disclosure was breached by Defendants', as more specifically identified above, through said Defendants' failure to disclose to the Plaintiffs material facts, to include, but not limited to, the physical means and methods, and corresponding risk of the same, that would be applied by Defendants upon and against Plaintiffs' children while the children were

in the care, custody and control of Defendants, to include all of the means and methods described hereinabove.

454. The failure of the Defendants to fully disclose such material facts was intentional and/or undertaken with reckless disregard for the rights and feelings of the Plaintiffs and/or their children.

455. Such failure was therefore fraudulent, this failure was undertaken with the intent to deceive Plaintiffs and to falsely assure Plaintiffs that their children were safe and secure while in the care, custody and control of Defendants. There was a tacit agreement among the Defendants to undertake this deception, knowing that the Plaintiffs and their children could be irreparably harmed.

456. Plaintiffs were consequently deceived by Defendants' and relied upon the failure to disclose such information critical to the well-being and safety of Plaintiffs' children, and Plaintiffs did, in fact, rely on these false and fraudulent misrepresentations and/or failures to disclose material facts, to the detriment of the physical, psychological and emotional well-being of the Plaintiffs and their children, and such fraud, accomplished by Defendants through their deliberate act(s) and/or omission(s), was a proximate cause of the resulting harm inflicted upon Plaintiffs' children as is described hereinabove. *See* details in Plaintiff Students' narratives in paragraphs 169-383 above, which are incorporated herein by reference, and detail each defendants' corresponding act demonstrative of fraud.

457. Such misrepresentations and failures to disclose were "material" to the breach of Defendants' duty owed to the Plaintiffs, as the Plaintiffs would have acted differently and taken measures to protect their children from harm by the Defendants (including refusing to enroll their children in the care of Defendants) had full disclosure of the potential harm to their children been disclosed to them.

458. The schools represented to or misled the Plaintiff Parents to assume that their children would be safely cared for. Such representation was false because the schools knew that physical restraints could be applied to the children, potentially causing them to suffer harm, yet failed to disclose this potentiality to the parents. The schools knew that such presentation was false when it was made. The identified Defendants intended for the Plaintiff Parents to rely on their representation. The Plaintiff Parents reasonably relied on such representation to their ultimate detriment. The children were harmed. The Plaintiff Parents' reliance on such representation was a substantial factor in causing the children harm. The Plaintiff Parents would not have permitted the identified Defendants to have custodial control over their children, knowing that the identified

Defendants school could, in its sole discretion, apply dangerous restraints to their children which could cause injury or even death.

459. Each and every one of the Defendants identified above undertook one or more wrongful acts and/or omissions as identified above to insure that full disclosure to the Plaintiffs of the potential for resultant harm to their children was not made, and such acts and/or omissions caused proximate harm to Plaintiffs and were accomplished by the Defendants intentionally, maliciously and/or with reckless disregard for the rights and feelings of Plaintiffs and their children, for which damages (including for severe and extreme emotional) distress Defendants are jointly and/or severally liable to Plaintiffs.

460. Plaintiffs seek compensatory and punitive damages against the above-referenced Defendants.

**FOURTEENTH CLAIM FOR RELIEF**

**(Tortious Breach of the Duty of Good Faith and Fair Dealing)**

STARK, DARROUGH, COUGHLIN, KINSER, DAVIS, CALER and MULLER against GHS, MEYERS, and KELLER

461. Plaintiffs incorporate by reference all preceding paragraphs.

462. In every contract where there is a special relationship between the tortfeasors (here the Defendants) and the victims (here the Plaintiffs and their children), a breach of such contract's implied covenant of good faith and fair dealing is actionable.

463. Here, there was a "special relationship" between Plaintiffs and all of the named Defendants, which was characterized by elements of public interest, adhesion, fiduciary responsibility and natural reliance. The Plaintiffs naturally relied upon all of the named Defendants to care for and protect Plaintiffs' children in a psychologically and physically safe environment, and Defendants represented, verbally and in writing and by advertisement, to Plaintiffs that such reliance was justified and would indeed be honored.

464. This representation by Defendants and corresponding reliance by Plaintiffs constituted a covenant of good faith and fair deal implied within Defendants' contract with Plaintiffs for the care and custody and education of their children, upon which Plaintiffs were entitled to rely.

465. This implied covenant was embedded within the written contract between Plaintiffs and Defendants for the care and custody of Plaintiffs' children because the nature of the contract required a need to "'protect the weak [the Plaintiffs' children] from the insults of the stronger [the

Defendants]' that is not adequately met by ordinary contract damages." *See K Mart Corp. v. Ponsock*, 103 Nev. 39, 49, 732 P.2d 1364, 1371 (1987). This remedy is also extended to situations in which one party (Defendants herein) holds "vastly superior bargaining power." *See Aluevich*, 99 Nev. at 217, 660 P.2d at 987.

466. This remedy is available to Plaintiffs because the aggrieving party (Defendants) was in a "superior or entrusted position" and has engaged in "grievous and perfidious misconduct." *See Great American Ins. v. General Builders*, 113 Nev. 346, 934 P.2d 257 (1997).

467. Each and every one of the Defendants undertook one or more wrongful acts and/or omissions to breach this implied covenant, and such acts and/or omissions caused proximate harm to Plaintiffs and were accomplished by the Defendants intentionally, maliciously and/or with reckless disregard for the rights and feelings of Plaintiffs and their children, for which damage Defendants are jointly and/or severally liable to Plaintiffs.

468. Plaintiffs seek compensatory and punitive damages against the above-referenced Defendants.

**FIFTEENTH CLAIM FOR RELIEF**

**(Assault and Battery Pursuant to California Penal Code Section 206)**

PLAINTIFF STUDENTS against GHS, MEYERS, and KELLER

M.S. against WOHLWEND,

SEBASTIAN against WOHLWEND

JAMES against WOHLWEND

PLAINTIFFS STUDENTS against GHS and OTHER YET-TO-BE-IDENTIFIED DEFENDANTS

469. Plaintiffs incorporate by reference all preceding paragraphs.

470. Said defendants, with the intent to cause cruel or extreme pain and suffering for the purpose of persuasion, or for a sadistic purpose, inflicted significant injury upon Plaintiffs by repeatedly assaulting Plaintiffs, throwing them to the ground and causing bruises, contusions and lacerations.

471. As a result, Plaintiffs suffered physical and psychological injuries.

472. Defendants acted negligently/reckless and/or with the intent to cause injury and that action and intention was despicable, done with a willful and knowing disregard of the rights of Plaintiffs.

473. Defendants acted knowingly and aware of the probable consequences of their conduct and deliberately failed to avoid these consequences, subjecting Plaintiffs to cruel and unjust hardship.

474. Defendants' conduct, assaulting a disabled child is so vile, base, and contemptible that it would be looked down upon and despised by reasonable people.

475. Defendants' conduct in intentionally assaulting and restraining Plaintiffs knowing of their disabilities was malicious and outrageous such that exemplary damages should be awarded.

***GHS and GHS Employees***

476. As described more fully above, Defendants GHS staff and employees acted negligently/reckless and/or with the intent to cause harmful or offensive contact to M.S. Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff M.S. in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of M.S. or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

477. M.S. reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

478. Defendants caused M.S. physical and emotional injuries.

479. As described more fully above, Defendants GHS staff and employees acted negligently/reckless and/or with the intent to cause harmful or offensive contact to DOMINIC Specifically, said Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff DOMINIC in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of DOMINIC or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

480. DOMINIC reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

481. Defendants caused DOMINIC physical and emotional injuries.

482. As described more fully above, Defendants GHS staff and employees acted negligently/reckless and/or with the intent to cause harmful or offensive contact to SEBASTIAN Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff SEBASTIAN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of SEBASTIAN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

483. SEBASTIAN reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

484. Defendants caused SEBASTIAN physical and emotional injuries.

485. As described more fully above, Defendants GHS staff and employees acted negligently/reckless and/or with the intent to cause harmful or offensive contact to JAMES Specifically, Defendants intentionally restrained or otherwise performed physical interventions on Plaintiff JAMES in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of JAMES or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

486. JAMES reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

487. Defendants caused JAMES physical and emotional injuries.

488. As described more fully above, GHS staff acted negligently/reckless and/or with the intent to cause harmful or offensive contact to ERIC. Specifically, Defendants intentionally restrained ERIC in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of ERIC or others and that could have been addressed by less restrictive measures. This restraint was not legally justified.

489. ERIC reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

490. Defendants caused ERIC physical and emotional injuries.

491. As described more fully above, GHS staff acted negligently/reckless and/or with the intent to cause harmful or offensive contact to HAYDEN Specifically, Defendants intentionally restrained or otherwise performed physical interventions on HAYDEN in response to predictable, disability-related behavior that did not present a clear and present danger to the safety of HAYDEN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

492. HAYDEN reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

493. Defendants caused HAYDEN physical and emotional injuries.

494. As described more fully above, GHS staff and employees acted negligently/reckless and/or with the intent to cause harmful or offensive contact to AUSTIN. Specifically, these Defendants intentionally restrained or otherwise performed physical interventions on AUSTIN in

response to predictable, disability-related behavior that did not present a clear and present danger to the safety of AUSTIN or others and that could have been addressed by less restrictive measures. These restraints and interventions were not legally justified.

495. AUSTIN reasonably believed that Defendants intended to cause him harmful or offensive contact and did not consent to it.

496. Defendants caused AUSTIN physical and emotional injuries.

497. As State and GHS administrators, Defendants TORLAKSON, MEYERS and KELLER had the responsibility and power to develop, implement and enforce policies and procedures regarding the use of physical interventions and restraints at GHS. Defendants created, implemented and maintained a policy and practice at GHS of subjecting students to restraints in response to predictable, disability-related behavior that did not constitute a clear and present threat to the safety of the students or others and that could have been addressed by less restrictive measures. Defendants knew and were deliberately indifferent to the fact that GHS staff were subjecting students to illegal restraints and other unreasonable physical interventions. Plaintiffs allege on information and believe that in some cases Defendants MEYERS, and KELLER participated directly in the restraints and physical interventions to which the Plaintiff Students were subjected.

498. Defendants' actions and failures to act were a substantial factor in causing the Plaintiff Students to reasonably believe that GHS staff intended to subject them to harmful and offensive contact to which they did not consent. As a result, the Plaintiff Students suffered physical and emotional injuries.

499. Plaintiffs seek compensatory damages and punitive against above-referenced Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court award the following:

1. For violations of the Americans with Disabilities Act
   a. Compensatory Damages
   b. Attorneys' fees and costs
2. For violations of Section 504 of the Rehabilitation Act of 1973
   a. Compensatory Damages
   b. Attorneys' fees and costs
3. For violations of Section 1983 (Violation of the Fourth Amendment)

a. Compensatory Damages
b. Punitive Damages
c. Attorneys' fees and costs

4. For violations of Cal. Education Code § 220
a. Compensatory damages
b. Attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5

5. For violations of the Unruh Civil Rights Act, Cal. Civ. Code § 51
a. Compensatory Damages
b. Treble Damages pursuant to § 52(a) (against GHS only)
c. Attorneys' fees and costs

6. For violations of the Ralph Act, Cal. Civ. Code § 51.7
a. Compensatory Damages
b. Exemplary Damages pursuant to Cal. Civ. Code 52(b)(2) (against GHS only)
c. Civil Penalty of $25,000 pursuant to Cal. Civ. Code 52(b)(2) (against GHS only)
d. Attorneys' fees and costs

7. For violations of the Bane Act, Cal. Civ. Code § 52.1
a. Compensatory Damages
b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (against GHS only)
c. Attorneys' fees and costs

8. For Battery
a. Compensatory Damages
b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

9. For Assault
a. Compensatory Damages
b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

10. For False Imprisonment
a. Compensatory Damages
b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)

11. For Intentional Infliction of Emotional Distress
    a. Compensatory Damages
    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)
12. For Negligence
    a. Compensatory Damages
    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)
13. For Fraud
    a. Compensatory damages
    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)
14. For Tortious Breach of the Duty of Good Faith and Fair Dealing
    a. Compensatory damages
    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)
15. Assault and Battery Pursuant to California Penal Code Section 206
    a. Compensatory Damages
    b. Punitive Damages pursuant to Cal. Civ. Code § 3294 (except against public entities)
16. On all claims:
    a. Post-judgment interest
    b. Such other and further available statutory or other relief that the Court may deem just and proper.

DATED: September 11, 2025.

/s/ *Merit Bennett*
Merit Bennett, *PHV Co-Counsel for Plaintiffs*